WEIL v. CHICAGO PNEUMATIC TOOL COMPANY.

Opinion delivered May 19, 1919.

1. CONTRACTS — SALE OF MANUFACTURED PRODUCTS — MUTUALITY.—A contract under which a dealer was given the exclusive right to sell manufactured products of a manufacturer, but with no right to recover loss of profits due to the latter's failure to fill orders, is lacking in mutuality in so far as it was executory.

2. SALES — CONTRACT ON SELLER'S BLANK — CONSTRUCTION.—A contract for the sale of manufactured products, drawn upon the seller's blank forms, should be construed most strongly against the seller.

Appeal from Jefferson Circuit Court; *W. B. Sorrells,* Judge; affirmed.

*Irving Reinberger* and *Bridges, Wooldridge & Wooldridge,* for appellant.

1. The contract was mutual, valid and binding, and could only be canceled as specified therein, and the court gave the clause as to loss of profits the wrong interpretation, one not intended by the parties, and erred in instructing a verdict for appellee. The contract was mutual, and the 60-day clause as to notice was valid and did not destroy the mutuality. 113 Ark. 556-563; 6 R. C. L. 689; 240 Fed. 801; *Ib.* 764-6; 250 Fed. 109; 157 Pac. 823; 145 N. W. 732; 174 Ill. App. 589.

See also 161 N. Y. S. 808; 174 App. Div. 830; 58 L. R. A. 227; 216 Fed. 269; 31 L. R. A. (N. S.) 249.

If the contract was executory it became executed when both parties acted upon it and appellee shipped and appellant received two of the cars he agreed to buy under the contract. He received two trucks ordered and had made a deposit on the third, which was never received. In addition he deposited $1,250 with appellee.

2. The clause prescribing the method to be adopted in case either party desired to cancel was binding alike on both parties, and the sixty days' notice should have been given. The cancellation clause should be construed to mean what the parties intended when they signed it, and unless the method adopted was followed, or a breach committed by appellant, it remained effective until the agreed date of its termination, May 31, 1918. 101 Ill. App. 140 is a case similar to this. See also 46 Ill. App. 327; 26 Ct. Ct. 132. These cases sustain our contention that if appellee desired the contract conceled it was necessary to give appellant the sixty days' written notice, and it could not by a mere statement saying that the contract was canceled, bring it to a close.

3. The provision precluding recovery for "loss of profits or damages from its failure to deliver goods ordered or for cancellation of this agreement," has but one construction, namely, that there should be no liability on part of appellee for loss of profits after their contract had been canceled in accordance with the terms of the agreement, but it could only be canceled in one way by giving appellant sixty days' notice. If one condition of the contract is binding, all of its conditions are binding. The company could not accept an order for 25 cars, $50 being paid on each car, and then for any reason cancel the contract and deny liability because, according to its contention, appellant had agreed not to hold it liable for loss of profits. 53 Ark. Law Rep. 232.

4. The contract was valid, mutual and binding and could only be canceled as specified in the contract, and the court gave the clause as to profits, etc., the wrong interpretation, and for the errors mentioned the judgment should be reversed and a new trial granted.

*Mehaffy, Reid & Mehaffy,* for appellee.

1. Since appellant admitted his indebtedness on the note and since the jury allowed him all of his counter-claim except loss of prospective profits, the only question left is whether under the contract appellee was liable for loss of profits from its failure to deliver goods to appellant. Appellant cannot recover for loss of prospective profits, because it is so stated in the contract, and this provision is valid and binding. The parties had the right to make such a contract and they are bound by its terms. 104 N. W. 10; 3 Elliott on Const. 15, § 1869. Even had not the contract so provided, yet the law limits the recovery for breach of a contract to those damages which are the proximate and natural result of the breach, and denies recovery for consequences which are remote and speculative. 3 Elliott on Cont., p. 327, § 2131.

Prospective profits are too remote and speculative. *Ib.,* p. 327, § 2131. Profits to be recoverable must have been contemplated by the parties and must not be remote or speculative. *Ib.;* 57 Ark. 203; 78 *Id.* 336; 80 *Id.* 228; 91 *Id.* 427; 97 *Id.* 522; 103 *Id.* 584; 111 *Id.* 474.

2. The contract lacked mutuality and was unenforceable. 7 A. & E. Enc. Law (2 ed.), p. 114; 90 Ark. 508; 96 *Id.* 188; 117 Fed. 58; 114 *Id.* 77; 143 N. Y. S. 1046; 220 N. Y. 749; 194 Fed. 324; 201 *Id.* 499; 237 *Id.* 860.

See also 100 Ark. 510; 102 *Id.* 621; 124 *Id.* 354; 125 *Id.* 305.

SMITH. J. The parties to this litigation entered into a contract which we copy in full, and for convenient reference we have numbered its paragraphs consecutively from 1 to 31. We set it out notwithstanding its extreme length because of the earnest insistence that all of its paragraphs must be read and construed together in order to arrive at the intent of the parties.

DEALER'S AGREEMENT
between the
CHICAGO PNEUMATIC TOOL COMPANY
and
S. C. WEIL, Pine Bluff, Arkansas.
Expires May 31, 1918.

This agreement, made and entered into this first day of June, A. D. 1917, by and between the Chicago Pneumatic Tool Company, a New Jersey corporation, party of the first part (hereinafter called the company) and S. C. Weil, of Pine Bluff, Ark., party of the second part (hereinafter called the dealer), Witnesseth: That,

Whereas, the Company is engaged in the manufacture and sale of Little Giant Motor Trucks, together with spare parts and appurtenances used in connection therewith, and is willing to sell said motor trucks to said Dealer exclusively in the territory hereinafter described.

Now, Therefore, In consideration of the mutual promises of the parties hereto, it is agreed as follows:

THE COMPANY AGREES:

1. To sell to the Dealer upon the terms and conditions hereinafter set forth, and during the period commencing June 1, 1917, and ending May 31, 1918, any number of its said motor trucks and parts and appurtenances used in connection therewith, which the Dealer may desire to purchase for resale by him in the following described territory: Entire State of Arkansas.

2. The Company will not, during said above mentioned period, sell within above described territory any of its said cars or parts and appurtenances used in connection therewith, to any person, firm or corporation other than the said Dealer.

3. To ship any and all cars ordered from it by the Dealer within thirty (30) days from the receipt by it of orders for the same; provided, however, the Company shall not be liable in any way for failure or delay in making shipments caused by strikes, fires or other causes beyond its control, or delays occurring in the

manufacture of its product or in the manufacture and delivery of parts thereof, and the Company shall not be liable for any loss of profits or damage for its failure to deliver goods ordered, or for the cancellation of this agreement.

4.  The Company will refer to said Dealer any and all inquiries for relating to said Motor truck which it may receive from any person, firm or corporation residing or being in said above described territory.

5.  The Company shall furnish the Dealer with catalogues and other advertising matter prepared by it and relating to said cars and the parts and appurtenances; the amount thereof, however, to be determined by the Company:

THE DEALER HEREBY AGREES:

6.  To purchase from the Company immediately upon the execution of this agreement at least ............... of said motor trucks to be used by him in said above mentioned territory for the purpose of demonstration and show exclusively.

7.  That he will maintain a repository and repair station for the satisfactory display, care and repair of said motor trucks; respond promptly to all inquiries respecting the purchase of said motor trucks; keep the Company fully informed as to the number of inquiries for, and sales of motor trucks within said territory, and any other matters affecting the interests of the Company in connection with this agreement; sell all motor trucks covered by this agreement, and all their parts and attachments in harmony with the policy of the Company, to maintain the reputation of its products.

8.  That he will appoint a Sub-Dealer or establish a branch for the sale and delivery of Little Giant Motor Trucks in every city or town within his territory that may at any time be designated by the Company, in order that the Company's products shall be adequately represented therein. That if the Dealer fails to secure a satisfactory representative for himself in any such city or

town as above provided, the Company shall be at liberty to appoint any other Dealer in such unoccupied territory, in which case Dealer shall not not be entitled to commission or credit for the volume of business handled by such additional Dealer.

9.   That he will be responsible to the Company for all acts of Sub-Dealers appointed by him, and that any acts of his Sub-Dealers which, if committed by the Dealer would be in violation of the terms hereof, shall be considered as acts of the Dealer.

10.   That in order to secure adequate and uniform service to the users of Little Giant Motor Trucks, all agreements with Sub-Dealers shall be made on forms to be furnished by the Company, containing such of the provisions of this agreement as are necessary for the purpose, and such Sub-Dealer's agreement shall not be put into effect until approved by the Company in writing in like manner as this agreement. All such agreements shall be made in triplicate and one copy filed with the Company immediately upon the execution of same.

11.   To purchase from the Company all such motor accessories and repair parts as the Company sells and the Dealer supplies for use on Little Giant Motor Trucks.

12.   That accounts for parts shall be due and payable on the 15th of each month for all parts shipped during the preceding month.

13.   That he will not alter any motor truck sold by the Company hereunder; that he will do nothing that will in any way infringe, impeach or lessen the value of the patents or trade marks under which Little Giant Motor Trucks or the parts thereof are made or sold.

14.   That in respect to sales of Little Giant Motor Trucks for use outside his territory, he will abide by the Company's policy, and further, that he will refer to the Company, whose decision shall be final, all controversies that may arise between him and another Dealer with regard to sales of Motor Trucks outside of said territory, or claims relating thereof; that he will pay all

claims decided by the Company to be due from him within ten (10) days after receipt of notice of the Company's decision. However, nothing herein contained shall be construed as a liability on the part of the Company to any Dealer for such profit.

15. That the Dealer will not deal in Motor Trucks not sold by the Company in such a manner as in the judgment of the Company will prejudice the sale or reputation of Little Giant Motor Trucks, or the good will of the name Little Giant, and as a matter of such business policy shall consult the Company before doing so.

16. That at the end of each month the Dealer will report to the Company the names, addresses and the business in which they are engaged, of all purchasers of Little Giant Motor Trucks; together with factory number of same.

17. That he will not transfer or assign this agreement or any rights hereunder.

THE PARTIES HERETO FURTHER AGREE AS FOLLOWS:

18. That this agreement shall be interpreted and construed according to the Laws of the State of Illinois.

19. The price to be paid by the Dealer for all complete chassis ordered by him from said Company shall be the full list price, less 25 per cent., F. O. B. cars factory, Chicago Heights, Ill., twenty per cent. of said price to be paid at the time order is given and the balance at the time shipment is made, or by sight draft attached to the Bill of Lading.

20. The price to be paid by the Dealer for all parts and appurtenances purchased by him hereunder shall be the full list price, less 25 per cent.

21. The Dealer is not in any manner authorized or empowered to conduct the business in the name of or for the account of the Company, nor in its name, nor on its behalf, to enter upon any contract whatsoever, or to bill goods to third person, nor to make promises or representations with respect to said commercial cars, parts or other goods manufactured or sold by the Company

other than those contained in the current catalogues issued by the Company.

22. It is expressly understood by the Dealer that no car will be sold by him, or shall be resold by him, upon any guaranty or warranty of any kind or nature except as follows:

"The Chicago Pneumatic Tool Company will, for a period of one (1) year, from date of shipment of any car manufactured by it, replace at its factory, at Chicago Heights, Illinois, free of cost except for transportation, such parts of said car, as shall in the sole judgment of the Chicago Pneumatic Tool Company prove to be defective in material or workmanship, and provided further, that such parts shall be shipped to the Company at its factory, when claim is made, charges prepaid, properly tagged, giving the serial number of motor truck from which same was taken, name and address of owner, and such other information as may from time to time be required by the Company. No claims will be allowed or adjustments made by the Company under the terms of this guarantee, unless Dealer's claim is presented, together with the alleged break or service failure within (10) days of discovery and that after the expiration of such ten (10) days no such claims will be allowed. This provision does not apply to parts or equipment not made by the Company, such as tires, rims, magnetos, batteries, coils and other electrical equipment, etc., for which purchaser must make all claims to their respective makers for damages of any nature growing out of this agreement, or for the sale or use of the motor trucks sold by it."

This guaranty shall not in any way apply to or cover any motor trucks which may be in any manner altered or repaired outside of the factory of the Chicago Pneumatic Tool Company or any of its branches.

23. That this agreement shall expire by limitation on May 31, 1918, or may be canceled by either party upon sixty (60) days' written notice given to the other through the usual course of mail or otherwise, provided,

however, that for any violation thereof by either party the other party may terminate the same forthwith. Termination or cancellation of this agreement as herein provided shall immediately cancel all orders for motor trucks, motor truck parts or attachments which may have been received from the Dealer, but which have not been delivered prior to the date of termination of cancellation, including such -orders as may have been accepted by the Company. After the termination or cancellation of this agreement, as hereinbefore provided, the continuance of the sale of such motor trucks or the referring of inquries by the Company to the Dealer shall not be construed as a renewal of this agreement, but all orders hereafter accepted by the Company and sales thereafter made by the Dealer shall be governed by the terms and conditions of this agreement.

24. That all claims for shortage must be made by the Dealer within ten days of receipt of the shipment on which shortage is claimed, and that after the expiration of ten days no such claims will be allowed.

25. That the responsibility of the Company for loss of or damages to goods ordered shall cease upon delivery thereof to the common carrier, and that the Company makes no warranties or representations of any kind other than contained in this agreement, as to the goods sold hereunder.

26. That the Company reserves the right to change all list prices at any time.

In witness whereof, the parties hereto have duly executed this agreement the day and year first above written.

Chicago Pneumatic Tool Company,<br>S. C. Weil, Dealer.

Attest .................................................

27.          ADDENDUM.

Model H-4—1-Ton Chain-Driven Chassis,
    Complete ......................................................................$1400.00
Model H-4—1½-Ton Chain-Driven Chassis,
    Complete ................................................................. 1500.00

Standard Platform and Stake Bodies for same.....$ 150.00
Standard Open Flare Bodies for same.................... 100.00
Standard Open Flare Bodies with Canvas Top
    for same .......................................................................... 150.00
Standard Cabs built on for same........................... 50.00
Standard Windshields built on for same................... 25.00
    Shown and described in Circular 282.
Model 1-15—1-Ton Worm-Driven Chassis, Com-
    plete ...................................................................... 1500.00
    Furnished with either solid or pneumatic tires.
Model 16—2-Ton Worm-Driven Chassis, Com-
    plete ...................................................................... 2250.00
    This can be furnished with 168-in. wheel base,
    making length back of driver's seat 140½ inches,
    at the same price.
Model   17—3½-Ton   Worm-Driven   Chassis,
    Complete .................................................................. 3250.00
Model 18—5-Ton Worm or Chain Driven Chas-
    sis, Complete ........................................................... 4250.00
    Built to order only.
    Shown and described in catalogue No. 285.

28.            ADVERTISING.

To agree to appropriate a sufficient amount of money to properly advertise locally in newspaper and outdoor publicity with the following understanding:

*First.* That this amount of expenditure is not to exceed One Hundred ($100.00) Dollars on each complete chassis; and, second, that fifty (50 per cent.) of the moneys so spent are to be charged by us to you.

Or, in other words, for every dollar you are willing to. spend we will also spend the same amount as outlined above.

29. YOUR DISCOUNT FROM LIST WHEN SOLD FOR CASH.

First car ordered by you on contract, 15 per cent.

Second car ordered by you on contract, 17½ per cent., with credit memorandum to make first car same price.

Third car ordered by you on contract, 20 per cent., with credit memorandum to make first and second cars same price.

Fourth car ordered by you on contract, 22½ per cent., with credit memorandum to make first, second and third cars same price.

Fifth car ordered by you on contract, 25 per cent., with credit memorandum to make first, second, third and fourth cars same price.

30. YOUR DISCOUNTS FROM LIST WHEN SOLD ON DEFERRED PAYMENT PLAN.

First car ordered by you on contract, 10 per cent.

Second car ordered by you on contract, 12½ per cent., with credit memorandum to make first car same price.

Third car ordered by you on contract, 15 per cent., with credit memorandum to make first and second cars same price.

Fourth car ordered by you on contract, 17½ per cent., with credit memorandum to make first, second and third cars same price.

Fifth car ordered by you on contract, 20 per cent, with credit memorandum to make, first, second, third and fourth cars same price.

31. We would expect you to contract for not less than 25 Little Giant Chassis, same to be taken by you during the period of this contract, which we would make for one year, at intervals to be decided on, but specifications must be furnished 30 days in advance and furnish us a deposit of $50 for each chassis, same to be refunded as you place orders.

We adopt the designations used in the contract and will refer to appellant as the Dealer and to appellee as the Company.

The Dealer had ordered and there had been delivered two trucks, in part payment of which the Dealer had executed his note. A third truck had been ordered, but shipment and delivery had been refused by the Company. In addition, the dealer had executed a note for

$1,250 in accordance with paragraph 31. This note was renewed and later paid by the Dealer; but the note given in part payment of the trucks was not paid, and this suit was brought to enforce its payment. By way of cross-complaint the Dealer prayed judgment for the portion of his deposit made under paragraph 31 which had not been applied to the purchase of trucks as there provided; and, in addition, the Dealer prayed judgment for the loss of profits which he alleged had been sustained as a result of the Company's failure and refusal to fill his order for trucks. Under the direction of the court the jury allowed the Dealer credit for the unapplied portion of his deposit made under paragraph 31, but disallowed anything on account of loss of profits, and the right to recover these profits is the question involved in this appeal.

The court below had the view that paragraph 3, which exempted the Company from damages for its failure to deliver goods as required by other paragraphs of the contract, rendered it void for the lack of mutuality, and that while it controlled the rights and obligations of the parties insofar as they had operated under it, it was unenforceable as against the Company insofar as it was executory. We have reached the conclusion that this is the correct construction of the contract and that the court, therefore, correctly told the jury that there could be no recovery of profits.

It is argued that we should construe this contract most strongly against the Company, as it has used its blank form in its preparation; and so we should. It is also insisted that in arriving at the intent of the parties we should construe the instrument as a whole. And the correctness of this contention is likewise conceded. And it is argued that when this has been done the plan under which the Company proposed to operate has been disclosed, and that if it has no valid and enforceable agreement with the Dealer here it has no valid and enforceable contract with any dealer anywhere. That its plan is to give exclusive rights to sell its goods to agents in

assigned territory. That the purpose and policy of the Company is to sell the largest possible quantity of the output of its factory and as a means to this end has assigned the territory throughout which it proposes to operate to agents who are given the exclusive right of sale in their respective territories and that having adopted this policy, as disclosed by the contract, we should not construe the contract as making its performance optional on the part of the Company.

It must, of course, be true that the contract lacks mutuality if one of the parties thereto has reserved the option of performing or not performing as he pleases, and while, indeed this right is not reserved in terms, we think this is the effect of paragraph 3. What does it matter that the Dealer may have assigned to him exclusive territory in which to sell the Company's goods if "the Company shall not be liable for any loss of profits or damage for its failure to deliver goods ordered or for the cancellation of this agreement?" If the language means what in its ordinary acceptation it apparently says, we have a writing which will determine the rights of the parties insofar as they operate under it but which has in advance excused and exempted the Company from legal liability for its non-performance through failure to deliver the goods ordered.

In 6 R. C. L., sec. 96, p. 691, the law is stated as follows: "Again, a contract which can be terminated at the will of one of the parties without liability for damages, so far as it remains executory, is not binding for want of mutuality."

And in the case of *El Dorado Ice & Planing Mill Co.* v. *Kinard,* 96 Ark. 188, this court said: "A contract, therefore, which leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other." See, also, 7 A. & E. Enc. of Law (2 ed.) 114; Page on Contracts, Vol. 1, secs. 302-6; *St. Louis, I. M. & S. R. Co.* v. *Clark,* 90 Ark. 508.

There appears to have been much litigation in the Federal Courts involving contracts more or less similar to the one now under consideration, and in these cases contracts having clauses similar to paragraph 3 have been held to be void for the want of mutuality. Some late cases which collect a number of others are: *Velie Motor Car Co.* v. *Kepmeir Motor Car Co.,* 194 Fed. 324; *Oakland Motor Car Co.* v. *Indiana Automobile Co.,* 201 Fed. 499; *Wilson* v. *Studebaker Corporation of America,* 240 Fed. 801. See, also, *Goodyear* v. *Koehler Sporting Goods Co.,* 143 N. Y. S. 1046; *Wood* v. *Glens Falls Automobile Co.,* 161 N. Y. State 808. Judgement affirmed.

McCULLOCH, C. J., (concurring). The mutuality in the contract consists of this: The manufacturer obligated itself to assign to the local dealer certain territory—the State of Arkansas—within which the latter was to have the exclusive right, for a given period of time, to sell the manufacturer's products; and, on the other hand, the dealer obligated himself to sell those products, and no others which might come in competition with them; to establish agencies throughout the territory, and to purchase from the manufacturer as many as twenty-five cars at a stated price. The right thus acquired by the dealer was a valuable one, notwithstanding the fact that the manufacturer was, under the express language of the contract, to be exempt from liability for damages on account of failure to deliver cars.

"A contract does not lack mutuality merely because every obligation of the one party is not met by an equivalent counter obligation of the other party." 6 R. C. L. 689.

It was to the interest of the manufacturer to sell the output of its factory in the various territories assigned to local dealers, and even though there was no corresponding obligation on its part to deliver to this dealer the cars which he might order, yet the obligation to assign this territory exclusively to the dealer, and not to sell to any one else in that territory, constituted suffi-

cient consideration for the various undertakings of the dealer, including the agreement to purchase a certain number of cars. The manufacturer was unwilling to bind itself to deliver any particular number of cars in a given territory for the reason, doubtless, that it could not be definitely known in advance what the sales in various territories would be, but we ought to assume, and the dealer had the right to assume, that the manufacturer would pursue a course consonant with its own interest by delivering as many cars as it could, consistent with its trade advantages in other territories, and the dealer was, therefore, willing to contract for the exclusive right to purchase for resale cars which the manufacturer might find it convenient to furnish in that territory. That constituted a valuable consideration for the whole contract and renders it mutual in its undertakings. There was a corresponding privilege to each of the contracting parties of canceling the contract on notice for sixty days, but that did not destroy its validity. The right to cancel the contract without notice for an appreciable length of time would have rendered the contract wholly nugatory, the immediate right of cancellation being inconsistent with the binding force of the contract, but when notice must be given for a length of time, it makes a valid contract because the obligation remains in force until the expiration of the specified period of notice. *Thomas* v. *Anthony,* 157 Pac. (Col.) 823.

I do not agree with the majority, therefore, that the contract lacks mutuality, but I think that the manufacturer has by plain and unambiguous language in the contract exempted itself from liability "for any loss of profits or damage for its failure to deliver goods ordered," and for that reason the judgment of the circuit court was, upon the undisputed evidence, correct.