of age. The donation was accepted for her by a tutor *ad hoc.*

The act of donation recites that the property donated, valued at $4,000.00, was intended as an advance to the donee out of the estate of the donor.

Fifteen years later, to-wit:—in January, 1884, after Mary Catherine Rhorer had become of age and while still unmarried, she and her mother joined in an act of formal revocation of the donation made to the former in 1869. This was nineteen years ago.

If, as defendant contends, the revocation is to be viewed as nothing more than a donation from the daughter to the mother, there was nothing in the way of the daughter, of full age and unmarried, making a donation of the property to her mother, and the effect of the act, whether it be looked upon as a rescission of the former donation from the mother to the daughter, or as a new donation from the daughter to the mother, was to re-invest indefeasible title to the property in the mother.

If it were a mere donation, the subsequent marriage of the donor, Mary C. Rhorer (if she did marry), and the birth of children of that marriage, could not affect the title. Such children could have no eventual right upon the property.

When an unmarried person of full age and otherwise capable of contracting, makes a donation of real property to another, and, later, marries and children are born of the marriage, such children, after the donor's death, have no recourse upon the property so donated on the plea of the impairment, by the donation, of their *legitime* as forced heirs. Woolverton v. Stevenson, 52 La. Ann. 1153, 27 South. 674. *Aliter,* if the donation were made *subsequent* to the marriage from which they sprung and their *legitime* were impaired by it.

So that the *status* of Mary C. Rhorer subsequent to the act of revocation is of no concern in the case.

But is the act of revocation to be viewed as a mere donation?

The question is answered in the negative by the decision of this Court in Scudder v. Howe, 44 La. Ann. 1107, 1110, 11 South. 824. See, also, Civ. Code, art. 1559, par. 4.

Judgment affirmed.

---

(34 South. 651.)

No. 14,610.

HORNBECK v. GILMER.*

(March 30, 1903.)

REAL ESTATE BROKERS—RIGHT TO COMMISSIONS—ATTACHMENT—AGENCY.

Syllabus of the Facts.

1. Plaintiff sought to sell his land through the agency of a broker, through whom another agent was called in to assist in effecting the sale.

Plaintiff had been informed of this, and did not disapprove of the action of his broker in employing some one to assist in effecting the sale. On the contrary, he accepted the services of both.

The buyer was sent to the seller by these agents.

On the Law.

2. Plaintiff proceeded by attachment.

Attachment laws are not repealed. They are only modified by Act 23 of 1900.

3. A special agent who employs another to assist in effecting a sale to the knowledge and with the approval of his principal, binds the principal to pay the fee (of which the seller had knowledge) promised to the one thus employed for the principal.

4. The owner had been informed of the amount to which the special employé or agent would be entitled. He is bound therefor by accepting the result of the services of the special employé.

5. Under the circumstances of this case, payment of the first special agent for his services was not payment to the second agent for his services in the matter.

(Syllabus by the Court.)

Appeal from Judicial District Court, Parish of Sabine; John Bachman Lee, Judge.

Action by Frederick A. Hornbeck against Alexander Gilmer. Judgment for plaintiff. Defendant appeals. Affirmed.

Holland & Holland and So Relle & Boone, for appellant. Sutherlin & Barret and William Pike Hall, for appellee.

Statement of the Facts.

BREAUX, J. Plaintiff brought this action to recover a commission on the sale of land made by defendant.

Defendant owned a tract of land in the parish of Sabine, containing about 8,000 acres, which about the first of the year 1900 he was willing to sell.

---

*Rehearing denied May 11, 1903.

Plaintiff was for several years the land commissioner for the Kansas City Southern Railroad Company.

For the past few years preceding the sale in question he had been engaged in business as real estate agent and broker, with his office in Kansas City, dealing in, buying, and selling Southern timber lands.

It appears that Mr. Dan Vandegaer, of the parish of Sabine, a surveyor, was also doing a similar business.

The record shows that plaintiff was well known to lumber dealers and buyers of land.

He avers that defendant, Gilmer, authorized him and Vandegaer, as real estate agent and broker, to put this tract on the market at the price of $12 an acre, agreeing to pay to them as commission for the sale 5 per cent. on the amount of the proceeds; that he published and circulated maps and plats of these lands, with explanation and information regarding their quality and advantages; that he drew the attention of M. B. Percival to these lands, and, together with Vandegaer, induced him to buy them; that, after the deed had been made, Gilmer, the defendant, refused to pay Vandegaer his half of the commission, and finally forced Vandegaer to accept an insignificant sum as his half of the commission.

Plaintiff sues for $2,400, with interest, and asked for a writ of attachment against defendant, who is a resident of the state of Texas, but he owns lands in the parish of Sabine.

Defendant excepted to the jurisdiction of the court on the ground of his being an absentee, who could not be brought into court by attachment; and, further, that Act No. 23 of 1900 provides for the citation of absent defendants by personal service, and has the effect of placing nonresidents upon the same footing with resident defendants as to the mode of citation; and repeals by implication any other mode of bringing them into court; and that the appointment of a curator ad hoc, and the service upon him, and the attachment of his property for the purpose of bringing him into court, is unauthorized by law.

This exception was overruled, whereupon defendant, in his answer, denied ever having placed his lands with plaintiff for sale, and that, if plaintiff listed them as he alleges, it was on his own responsibility, without promise of commission; that plaintiff was not known in the sale of the land. A number of letters passed between plaintiff and defendant, requiring special attention in arriving at the facts of the case. We will review them in the order of their dates.

In the first letter addressed by Mr. Ragsdale, a real estate agent, of San Antonio, Tex., to defendant, he says to him that he understands that defendant owns about 8,000 acres of land, and requests to be informed of the lowest price (if the land be for sale); the price to include a commission of 5 per cent. to himself should he find a purchaser. To this defendant replied by letter of March 2, 1900, that his price was $12 per acre; that he had put it in the hands of other parties; that he could not give him the exclusive right to sell the lands, as it was in the hands of other parties, but that, if he could find a buyer within 60 days at his price, he would pay him the 5 per cent. commission.

On March 21, 1900, plaintiff, Hornbeck, sent a telegraphic message to defendant, requesting him "to wire lowest cash price on his land." The dispatch was answered, and in the defendant's letter confirming the dispatch he sets out that "the price of the land owned by him in Sabine parish is $12 per acre. There is in this tract 8,065 26/100 acres, and should you desire to buy I will be glad to hear from you at once."

To this letter plaintiff answered on March 24, 1900, as follows:

"Vandegaer some time ago told me you were holding your lands near Many at $12.00 per acre, and I never gave it much thought for the reason that a man could not pay this price to hold for an investment, but the other day a party came to me wanting a mill site and I desired to wire you and obtain the lowest figure on the property. He is not willing to pay $12 per acre for lands that will not cut over 8,000 feet to the acre, but I think this party would pay $8.00, or possibly $8.50, per acre, and close the deal at once. I do not wish to 'jew' you down on your price, but I think you realize that good pine lands are now being bought for 75 cents to $1.00 per thousand stumpage, and that according to market price your lands are worth $8.00 per acre. This party means business, and has other tracts in view; so if you feel like coming anywhere near his figure I should be pleased to hear from you.

"Will you kindly give me your exact acreage near Many."

To this defendant answered, inclosing a map of the 8,065 acres, together with estimate of timber on the land, and added that the price asked was not excessive, and mentioned that he had other lands for sale, and stated his price. He inclosed in this letter a written statement being the estimate of acres made by Dan Vandegaer.

On the 26th of April, 1900, plaintiff wrote to defendant as follows:

"I enclose you one of our timber land circulars just issued. As you will note I have taken the liberty to place your tract on same together with two other tracts as it occurred to me that I could bunch the three and offer them at $8.00 per acre. Now, I wish to ask if you will not give me the exclusive sale of your tract for the next 60 days, stating what terms you require in case of sale, as I have been to a great deal of expense in having the circulars printed and in getting them out to about 5,000 lumbermen and investors. Having been land commissioner of the Kansas City, Pittsburg and Gulf Railroad for the past 7 years, I have been able to get in correspondence with the best class of investors and probably stand as good a show to sell your property as any one in this business. Will you kindly give me a prompt reply to the above.

"My commission for selling is 5 per cent. I also wish to state that a Mr. Percival, of this city, is now looking over your tract; and if he should correspond with you, this is to inform you he comes through me."

Another letter on the 2d of May, 1900, is as follows:

"Will you kindly reply to mine of the 26th ulto. wherein I ask for the exclusive right to sell your 8,000 acres in Sabine Parish, Louisiana, and also the terms of sale in case I should make one. You may not be willing to give me the exclusive right, but I should like to have you favor me in this way; that is, when I have a party who will go to the expense of investigating I think you should be willing to give me a week's refusal to protect the man who is giving his time and expense in examining it. I wish you would write me upon receipt regarding this, and also the best terms you will make in case the sale is made; that is, how much cash you will require

down, and the deferred payments, and the interest on same."

To which defendant answered on May 7, 1900, that he had closed the deal, and expected to have the papers prepared on the 20th May, 1900, and that for that reason he could not give the refusal asked for by plaintiff; that, if the deal fell through, he would advise him.

On the 22d of May plaintiff again wrote to defendant, requesting to be informed whether he had perfected sale to Mr. Percival, and that, if he had not, he had another party who desired to buy.

On the 16th of June, 1900, plaintiff wrote to defendant that he had just learned of the sale, and that, as he had previously written, his commission was 5 per cent., and that he would settle with Vandegaer. He says in this letter: "As I informed you before, Mr. Percival was my customer, and I trust you will send me a draft for $4,839 upon receipt."

There are other letters between plaintiff and defendant. In April Dan Vandegaer also wrote to defendant, saying to him, among other things:

"If Mr. Ragsdale can furnish you a buyer I want to treat him perfectly square and give him a chance, but if the sale is made to a Hornbeck party, he will expect part of the commission, which I assume you will be willing to pay."

On the 22d of April, 1900, Dan Vandegaer wrote to defendant, informing him of a contemplated call on defendant by Percival, and preparing him to meet the future buyer.

Percival did call, and after much talk defendant sold to him for the price of $96,000.

Plaintiff, in his own behalf as a witness, testified that he advertised the land with other lands, in all 25,000 acres; that he had a timber circular printed and circulated. This was done by the Hornbeck Company, of which plaintiff is the only member.

Plaintiff further states that he first came in touch with the land through Mr. Vandegaer, who spoke to him about them, and asked him to find a purchaser. It was then he listed them for sale. He says also that he notified defendant, Gilmer, by letter, that he had listed and advertised his lands for sale on commission, and that he was not informed of any objection.

This witness states that the only agree-

ment he claimed to have entered into with defendant is that shown by the letters introduced in evidence.

With reference to telegram 8, informing him that the price was $12 per acre, witness said that he construed $12 and 5 per cent. commission, for the reason that he had it from his (Gilmer's) own agent, Vandegaer, who held his power of attorney, and the contract with the agent was $12 per acre and 5 per cent. commission.

From the letter by defendant to Vandegaer, we extract the following:

"I will be glad if you will make the sale with the parties you have been negotiating with, and if they come here, I think the trade can be put through if they mean business. You will be fully protected in the matter of commission."

Vandegaer, as a witness, testified that Percival came to him from Hornbeck. This has some corroboration in the testimony of Shearer, a witness in the case; also from the fact that Percival had, when he arrived at Many, maps and information which the weight of the testimony shows he received from Hornbeck. Vandegaer said that some time afterward he was told by Percival that he wanted to beat Hornbeck out of his commission; "that he (Hornbeck) had treated him shabbily." (Parentheses ours.) He went with Percival to inspect the land, and informed him of the price. Vandegaer said as a witness, "Gilmer told me he would give the 5 per cent. commission" to any one that would find a purchaser, and that he informed Hornbeck of that fact. Gilmer and Percival came over from Orange, Tex., to Many, La., to execute the deed.

Gilmer said to Vandegaer that Percival had informed him (Gilmer) that he (Percival) made the deal on his own responsibility, and he wanted the commission, and that he (Gilmer) agreed to give him (Percival) $4,000. He (Gilmer) at first offered $100 to Vandegaer. He increased the amount to $300, and Percival, on his part (why does not appear), added $200, making in all $500, which witness accepted.

The following question was propounded to this witness:

"Q. Did you or not, in that conversation, remind him of the letter he had written you,

telling you to send Percival over there; he would protect you in your commission?

"A. I did."

Vandegaer was expecting one-half the commission, as he inferred that such was the agreement, and that, in addition, he would pay the other one-half to Hornbeck, with whom he had co-operated in effecting the sale.

## Opinion on the Exception.

With reference to the attachment taken out by plaintiff of which defendant complains.

True, statute 23 of 1900 to some extent modifies prior laws relating to attachment suits, and in some respects places nonresidents on the footing with residents. It does not, however, repeal prior laws. Absentees. can, as heretofore, be brought into court by attachment proceedings.

The only objection raised is that defendant is a nonresident. It is well settled that a nonresident, who owns property in this. state, can be sued and forced to come into this state to defend a suit.

In reference to the asserted repeal of prior law by the subsequent statute cited supra, it is answer enough to say that, whilst it is. true that where a statute provides a new remedy where none existed before, the presumption is that the remedy was meant to be exclusive. The presumption · does not arise in the case, as it is not a new specific remedy, and, besides, nothing in the statute indicates that it was meant to be exclusive.

The statute at most provides an additional mode of citation, not an exclusive mode. There is no merit in defendant's complaint against the attachment as made. We take up the question of the commission claimed.

The buyer gained the information which· led him to come to Sabine and confer with Mr. Vandegaer from plaintiff, Hornbeck. He mentioned the latter's name, and had maps and plats in his possession, handed to him by plaintiff, who had prevailed upon him to come and examine defendant's land as a prospective buyer. The buyer said to a witness— Shearer—that he was in Sabine in compliance with Hornbeck's solicitation.

Vandegaer showed him the land, and sent him to Gilmer, who had said to Vandegaer·

that he was willing to pay commission of 5 per cent.

It was in compliance with Gilmer's request that Vandegaer referred Percival to him. Gilmer had assured Vandegaer (to quote from his letter):

"You will be fully protected in the matter of the commission."

Writing to Ragsdale, Gilmer said that he would pay 5 per cent.; that the land was in the hands of the other parties. The only other parties are Vandegaer and plaintiff, with whom he was co-operating to effect a sale of the land.

Hornbeck had notified defendant that, if Percival called on him, it would be through him (Percival).

Vandegaer had notified plaintiff that "if the sale is made to Hornbeck's party, he will expect part of the commission, which I assume you will be willing to pay"; that is, 2½ per cent. This was on April 11, 1900.

After he had been thus informed, Gilmer wrote to Vandegaer: "Let me know how you are progressing on the sale of the 8,000 acres, and what the prospects are for closing the sale."

As late as June 8, 1900, Gilmer informed Hornbeck by letter, as follows:

"In reply to your favor of the 6th inst., I beg to advise you that the trade with Percival is practically closed, but, should the same fall through, I will advise you."

From the facts we infer that Vandegaer was unquestionably employed by Gilmer, and that Gilmer knew that Vandegaer was co-operating with Hornbeck to effect a sale, and defendant knew that Percival, prior to calling on him, had been with Vandegaer looking at the land and talking of buying it.

We are impressed with the fact that Percival, the buyer, would never have found his way to Gilmer, the defendant, if it had not been for the agency of Hornbeck and Vandegaer.

It was, when Percival called on Gilmer, the owner, too late in the history of this sale for Percival to make terms for a commission to the prejudice which Gilmer had pronounced to Vandegaer, and which Vandegaer had advised Gilmer was to be divided equally with Hornbeck. Upon this subject the American & English Encyclopedia of Law (2d Ed.) vol. 4, p. 879, contains an interesting paragraph, in which the view is expressed that "a principal cannot complete a contract by a broker, and ignore the broker entirely as relates to his fee. He cannot deprive him of his fee by discharging him. And again, if the broker were the procuring cause, he is entitled to his commission without regard to the extent of his exertion." Id.

See, also, upon the same subject, Levistones v. Landreaux, 6 La. Ann. 26.

But the defendant quotes Vandegaer's testimony, who said that the commission was to be divided equally; that it was to be paid to him; that he was to pay Hornbeck; that he did offer to Hornbeck one-half the commission he had received from defendant—i. e., one-half of $300.

We think it sufficient to recall that Vandegaer had written to Gilmer, "If the sale is made to Hornbeck's party, he will expect part of the commissions, while I assume you would be willing to pay 2½ per cent.;" to which Gilmer replied, "I am willing to pay a commission of 5 per cent. on the sale," and, when suggesting that Percival should call on him, who was then with Vandegaer, in substance, "Let him call to see me; you will be fully protected in the matter of your commission"—quoting from one of the defendant's letters.

Considering all the facts and circumstances, we think it reasonable to conclude that Gilmer did not obtain a release from Hornbeck by settling as he did with Vandegaer.

Defendant attended to the business from the first, as owner. He was doubtless aware of the facts, and yet he did not testify upon the trial of the case, and no reason is suggested by the testimony in the record for his failure to testify. Without the light which, perhaps, defendant's testimony would have brought to bear on this sale, or his denial or affirmance of certain facts, we think it only remains for us to affirm the judgment.

For reasons stated, the law and the evidence being with the plaintiff, it is ordered, adjudged, and decreed that the judgment appealed from is affirmed at appellant's costs.