[Civ. No. 11559.   Second Appellate District, Division Two.—November 18, 1937.]

W. B. HALL, Appellant, v. DOUGLAS AIRCRAFT COMPANY, INC. (a Corporation), Respondent.

Raymond L. Haight, Arthur L. Syvertson, Haight, Trippet & Syvertson and John S. Haven for Appellant.

H. W. Elliott and Edward P. Fogg for Respondent.

WOOD, J.—Plaintiff appeals from a judgment in defendant's favor in an action in which he seeks judgment for the reasonable value of services performed for defendant at its special instance and request in the matter of the sale of twenty airplanes to the Nationalist government of China.

In the summer of 1930 Captain W. B. Hall, the plaintiff, and Captain F. N. Shumaker were located in the neighborhood of Shanghai. Both were experienced aviators and both were in touch with certain officials of the Chinese government. Shumaker was in the brokerage business and acted as the representative of defendant in a number of transactions in the Orient both within and outside China. Before the consummation of the transaction which is the subject of this litigation the Douglas company had effected two sales to the Chinese government. In one of these transactions ten airplanes were sold by defendant through the instrumentality of Captain Shumaker and in this transaction Captain Hall took no part. The ten airplanes were sold for $255,000, Shumaker receiving a commission in the sum of $25,000.

The trial court found that ''the compensation agreed upon to be paid to Shumaker for sales of airplanes was the 'differ-

ential'—so-called—between the price the seller stated to him it would accept and any greater amount for which the sale was actually made''. On the transaction involving the ten airplanes the required net price to the factory was $23,500 for each plane, the difference between the factory price and the sales price being $2,000 per plane. It is apparent that in this transaction Shumaker received more than the ''differential''.

The other prior transaction involved the sale of airplane parts and concerning this matter the trial court found: ''During the same period and about July, 1930, Shumaker negotiated a sale of airplane parts for defendant to the Chinese government, and during such negotiation, Shumaker engaged the services of plaintiff, W. B. Hall, to assist in effecting such a sale, promising to pay him fifteen per cent of whatever the sale price would be. Such sale was effected for a price of $60,000, and after some delays the fifteen per cent commission, or $9,000.00 was paid by defendant direct to plaintiff on Shumaker's direction and charged on the books of defendant as commission paid to W. B. Hall, he, Shumaker, receiving as a balance on such commission, the sum of $8,500.00, and on said sale of airplane parts for $60,000, a total commission of $17,500.00 was paid by defendant.''

Concerning the sale of the twenty airplanes, which is the subject of the litigation, the trial court made findings in unusual detail and quotations from these findings may be advantageously made:

''The Court further finds that while still occupying the status of a merchandise broker, with compensation to be measured by the 'differential' method and coincident with the consummation of the sale of airplane parts above referred to, defendant directed Shumaker to negotiate a sale of twenty or more airplane bombers to the Chinese government at the price of $24,000 per unit on certain terms as to method and time of payment, the compensation in case of sale to be determined by the 'differential' resulting. Thereupon, Shumaker appointed plaintiff as his assistant in this transaction and cabled to defendant information of that fact on September 4th, 1930, and requested defendant to cable direct to the Chief of the Bureau of Aviation of the Chinese government that plaintiff was authorized to negotiate with the Chief of the Bureau of Aviation for direct telegraphic contract between

the Bureau and the factory for twenty airplanes with specifications the same as the last ten that had been sold to the Chinese government. This the defendant did by cable of the same date. Shumaker gave plaintiff oral and specific written instructions to the effect that he was to hold this proposition in line, not to appear as agent or broker, but to advocate and exert every effort to persuade the officials of the Aviation Bureau to recommend to the Government and especially to the Minister of Finance, who furnished the money, the purchase of Douglas airplanes. This arrangement all resulted from a situation which had arisen in China, whereby Shumaker had become *persona non grata* with certain Chinese aviation officials, while plaintiff was in their confidence and possessed considerable influence personally over these officials who would have most to do with recommending what aviation products should be purchased. Also, to satisfy the Minister of Finance there would be no improper division of commissions, it was recommended by Shumaker to the defendant Company that the sale should be a direct sale between the buyer, the Chinese government, and the defendant, as seller, with no apparent agents or intermediaries. Shumaker again employed the plaintiff to assist him, and at the inception of this employment of the plaintiff, nothing was agreed upon as to the compensation of the plaintiff, but Shumaker stated that plaintiff would be protected by the company 'one hundred per cent'. At the same time, defendant cabled plaintiff 'to do everything possible assist technically any direct transactions between Bureau and ourselves'.

''The Court further finds that under these arrangements, plaintiff immediately, early in September, 1930, began a sales campaign on behalf of Douglas planes and products, centering his efforts on aviation officials of the Chinese government, while Shumaker left China and returned to the United States and to the factory of defendant at Santa Monica, California. Shumaker sailed from China on or about September 6th, 1930, and returned to China about the first day of November, 1930, leaving shortly thereafter for northern points and Manchuria, and did not return to Shanghai until April 1, 1931. While in Shanghai on his return in November, 1930, Shumaker dissolved his China company and informed plaintiff that he personally had authority from defendant to sell airplanes and parts on terms as to compensation the same as

before and that if a sale could be consummated he would allow plaintiff three-fourths of the 'differential', which was to be his (plaintiff's) share of compensation, as stated by Shumaker to plaintiff in his letter of September 6, 1930. During Shumaker's absence, he kept in touch with plaintiff by letter and by wire and plaintiff and defendant also were in constant cable and letter communication.

"The Court further finds that during this period, plaintiff owned and operated a garage in Nanking, the seat of government then in China, and within a short distance of the aviation field and headquarters. He left a superintendent in charge of his garage and devoted the greater part of his time from September 6, 1930, to May 23, 1931, in efforts to persuade the aviation officials to surely recommend to the Finance Minister the purchase of Douglas planes, if and when the Finance Minister would agree to supply money for a purchase of planes.

"The Court further finds that it was recognized and known by all concerned that the Government would not buy bombers unless and until a necessity arose by reason of an anticipated rebellion in Canton. Such a rebellion became imminent in the first week of May, 1931. Shumaker had again, in April, sailed for the United States, arriving at his home in Denver about May 1, 1931, having left plaintiff in China to press upon the Chinese officials the proposition of buying only Douglas planes, and plaintiff did so continue to press such proposition up to May 19, 1931.

"The Court finds that on May 8, 1931, the Finance Minister cabled to defendant asking for bedrock price on twenty bomber planes. Defendant on the same day cabled the price of $24,000.00 per unit. The Finance Minister cabled back an offer of $20,000.00 per unit on May 9. In reply, on the same day, defendant cabled its refusal to reduce its price. On May 12, defendant, after a telephone conversation with Shumaker who was in Denver, cabled to plaintiff asking if he was 'now in position to secure the business now pending'. On May 13 the Chief of the Aviation Bureau cabled to defendant stating that the Government would offer $22,000 per unit, and strongly recommended its acceptance. On May 14, not having received a reply from plaintiff to its cable of May 12th, defendant cabled plaintiff canceling 'all arrangements to represent us'. In the meantime, defendant com-

municated by telephone with Shumaker in Denver on May 12, informing him of the offer of $22,000 and inquiring if he had word from plaintiff. Shumaker then cabled to plaintiff, but received no reply until May 21st. In the conversation with Shumaker the price reduction from $24,000.00, asked, to $20,000.00, offered, was discussed and also its effect on Shumaker's commission or 'differential', and Shumaker recommended that defendant effect the sale at all costs and disregard his commissions down to one per cent of the sales price.

"The Court finds that at this same time, a certain eastern company, owning an interest in defendant company, had sent a Captain Westervelt to China as its representative, chiefly to effect the erection of an airplane plant in China, which would cost approximately $200,000 and would be built and owned jointly by the Curtis Aviation Company, the Douglas Aircraft Company and the Inter-Continent Aviation Company. On May 14th defendant received from New York, a telegram from the president of this eastern company suggesting that in view of the pending transaction for twenty Douglas bombers, defendant should appoint Captain Westervelt as its agent in China to represent defendant in the proposed sale. On May 15th, defendant received a cable from plaintiff announcing, among other things, that the order for the planes would 'be executed sooner than expected'. The Court finds that there was some confusion of words in this cable upon decoding, and defendant cabled on the same day to plaintiff, asking him to repeat in clearer language.

"There was no answer from plaintiff until May 19, when he answered the cable of May 14, canceling his authority, advising defendant not to discontinue his services. On May 18, defendant cabled to the Finance Minister of China, announcing that Captain Westervelt was the only person authorized to represent the defendant and to negotiate the sale with him. On the 19th, defendant cabled to plaintiff, refusing to alter its decision of cancellation and advised plaintiff of the appointment of Captain Westervelt as its representative in China. On the same day defendant cabled to the Chief of the Aviation Bureau its refusal of the $22,000.00 offer, informing him that Captain Westervelt was defendant's representative in China and offering to sell twenty bombers equipped with Wright cyclone engines instead of Hornet engines, for

$23,000.00 per unit. On May 20, Shumaker wired to defendant from Denver, suggesting advice to Captain Westervelt to propose the sale of the bombers for $22,000.00 with some alterations as to bomb racks, and that this would 'allow us to come out on a commission arrangement five hundred without injuring business in any way'. On the same day, defendant received a wire from the president of the eastern company reporting that Captain Westervelt had cabled that the Minister of Finance would positively not pay more than $22,000.00 and would probably accept cyclone engines, and asking 'shall we accept for Douglas Aircraft Corporation'. On the same day, defendant cabled acceptance and wired to Shumaker, stating that it had offered to sell for $22,000.00 per airplane, and that 'you are protected as per telephone conversation for total commission on twenty airplanes of five thousand dollars'.

''On May 21st, plaintiff cabled to defendant explaining the reason for delay in answering previous cables, and stated therein: 'Your agreement with me binding until court decides otherwise'. On May 23, 1931, the Bureau of Aeronautics of the Ministry of War of the National government of the Republic of China, as buyer, and defendant company as seller, signed a contract of purchase and sale of twenty Douglas airplanes at a price of $22,000.00 per unit of $440,-000.00 in all, Captain Westervelt signing for the defendant company and the Chief of the Bureau of Aeronautics for the buyer. The $440,000.00 was paid and the transaction was consummated; the airplanes were sold and delivered by the defendant to the National government of China. Thereafter the defendant paid to Shumaker $5,000.00 . . .

''The Court finds that the services performed by plaintiff in the campaign to sell Douglas airplanes to the National government of China as hereinabove found were valuable and were performed at the request of Shumaker and with the knowledge and consent of defendant, as hereinabove found. No specific finding as to the value of said services is herein made because of the conclusion of the court that defendant is under no obligation to pay the value thereof.''

The trial court further found that a rebellion became imminent in the southern part of China in April and May of 1931 and that certain officials of the Nationalist government withdrew and went to Canton. Plaintiff had urged these

officials to purchase the Douglas airplanes. In June, 1931, plaintiff left Shanghai and went to Canton where he accepted employment with the Cantonese government.

In its cablegram to the Bureau of Aviation of China under date of September 4, 1930, defendant stated: ''Bert Hall authorized to negotiate with you for direct telegraphic contract between you Bureau and ourselves twenty airplanes same as last.'' Three days later defendant sent to plaintiff the cablegram mentioned in the findings asking him to do everything possible to assist in the sale. Thereafter many communications passed between the parties. Early in May, 1931, a letter was written by defendant to plaintiff as follows: ''Dear Bert: Your letter of April 6th came during my absence from Santa Monica, hence the delay in answering it more promptly. Upon my return, Thursday, we received a cable from T. V. Soong requesting a firm offer on 20 0–2MC observers. It sounded like real business and we cabled a price of $24,000.00 each, gold, for prompt acceptance. We promised deliveries to start June 20th and to complete the order July 20th. Today Soong wired offering us $20,000 each, with deliveries to start first week in June. Of course both terms are out of order, and we regretfully so advised him. We are anxious for the business, and will do all possible to get it, except accept it at a loss to us. The price of $24,000.00 included your commission of $2,000.00 each. We are giving you this information for what it is worth. Am hoping that Soong will realize that our ships are built to a quality standard and not to a price standard, and that the order will come along before this letter reaches you. Your cable of May 1st relative to spares was received. We are awaiting the arrival of your list of requirements, and as soon as we have this in hand, we will quote prices . . . Please keep us advised as to your activities. Rest assured that we are anxious to get a big share of the Chinese business and will meet them more than half-way. On the other hand, remember that it is not our policy to sacrifice quality for price—and eventually acquire a rotten reputation. With best wishes for your continued success.'' This letter was not received by plaintiff until after the cancellation of his appointment.

It will be noted that plaintiff's duty was to urge upon the officials of the bureau of aviation that they recommended to the minister of finance the purchase of the Douglas planes

but he was not to directly contact the minister of finance, It will also be noted that Shumaker was absent from China during most of the period covered by the transaction and that even if in China he could not do effective work since he was not in the good graces of the officials of the bureau of aviation.

Plaintiff contends that the trial court erred in ruling that defendant did not incur liability to compensate plaintiff for the services rendered. This contention must be upheld. Since Shumaker was not in position to deal personally with the officials of the bureau of aviation and was also about to leave China it was, as Shumaker cabled to Douglas on September 4th, necessary to designate someone else to handle the matter before the bureau. Shumaker accordingly appointed plaintiff to further the interests of defendant and promptly notified defendant of the appointment. Defendant in turn ratified the appointment, notified the Chinese government of it and gave instructions directly to plaintiff to proceed. All of this took place before the services were performed. The correspondence between plaintiff and defendant continued until after a definite offer had been received from the minister of finance, at which time defendant wrote to plaintiff of the offer and asked him to "keep us advised as to your activities". In one communication defendant informed plaintiff that Shumaker "sails Saturday on several missions for us and will only assist confidentially your propositions". On May 2, 1931, Shumaker wrote to an official of defendant company: "My advice to you in the matter is to leave it to Bert: he is in continuous touch with the right people". By its ratification of the appointment and its subsequent conduct in directing plaintiff concerning the conduct of the negotiations defendant constituted plaintiff its own agent and became liable for his compensation. It is a general rule that in the absence of an agreement to the contrary a request by one party to another to render services gives rise to a liability to compensate for the services when rendered.

The view that defendant became liable to compensate plaintiff for the services rendered finds support in a number of cases. In *Fisher* v. *Berwind-White Coal Min. Co.*, 64 W. Va. 304 [61 S. E. 910, 911, 131 Am. St. Rep. 898], one Rease, the agent of Berwind, employed Fisher to secure

coal lands or options and Rease told Fisher that he would get a commission if the lands were actually bought. In allowing Fisher to recover from Berwind the court said: "It is noted that but little reliance is placed on the contention that Fisher did not become the agent of Berwind in the transactions had in pursuance of said contract, and rightly so, for it appears clearly that such relationship existed. Berwind became the owner of the 860 acres of coal through the subagency of Fisher. This fact is manifestly shown, and also that Berwind's manager in Philadelphia was in touch with the work which was being carried on by Fisher, and was advising with him in the premises, personally, as well as through Rease. Fisher's employment was thus impliedly authorized and ratified by Berwind, and the latter is liable for his compensation." In *American Oil & Refining Co.* v. *Clements,* 99 Okl. 204 [225 Pac. 349], the defendant authorized the Oklahoma Oil Securities Company to sell its stocks. The latter company employed the plaintiff on commission basis of 10 cents per share sold. The plaintiff procured a purchaser for 38,000 shares, and sued both companies for commissions for securing this order. The court, in sustaining the plaintiff's contention, said: "There is no question, in our opinion, that the smaller company, as broker, had full authority to employ agents for the sale of the stock of the larger company, and, under the peculiar circumstances in this case, that the larger company authorized the smaller company to employ subagents and had full knowledge of the employment of this plaintiff, and that it acquiesced in and ratified the employment of plaintiff, and, this being our conclusion, all authorities agree that the larger company was responsible to the plaintiff for the payment of this commission." (See, also, *Large* v. *Frick Co.,* 215 Mo. App. 232 [256 S. W. 90]; *Hornbeck* v. *Gilmer,* 110 La. 500 [34 So. 651]; Story on Agency, 9th ed., sec. 387; Mechem on Agency, 2d ed., sec. 332.)

The parties present a sharp conflict on the subject of the basis for the compensation for the sale of the airplanes, defendant contending that it was agreed that the "differential" method should be applied and that, in view of the price at which the airplanes were sold, there was no "differential". To this contention plaintiff replies that as to him there is no evidence in regard to the "differential" method which

can operate to deprive him of his right to compensation and that even as to Shumaker no net price to the factory is shown by the record and that the fixing of the price remained in the control of the defendant. It is unnecessary for us to decide between these contentions for in any event under the undisputed facts as shown by the record plaintiff is entitled to compensation for the reasonable value of the services rendered. For a period of eight or nine months plaintiff devoted the greater part of his time in furtherance of the sale of defendant's airplanes. At the time the sale was about to be consummated his authority was canceled. At that time defendant had received an offer from the minister of finance and negotiations were shortly thereafter completed to effectuate the sale. It was not a part of plaintiff's duties to conduct negotiations with the finance ministry but rather it was his sole duty to contact the bureau of aviation. Captain Westervelt, who was appointed by defendant as its representative in closing the deal with the minister of finance, was engaged to perform services of a nature different from those plaintiff was called upon to perform. It appears from the findings that alterations were made in the specifications of the airplanes originally offered by plaintiff and defendant, with the result that defendant was enabled to sell at a reduced price. It is significant to note that Shumaker received the full amount he expected to receive on the transaction while plaintiff is left without any remuneration for the services rendered by him covering a period of many months. Defendant stresses the point that plaintiff's influence was with those officials who joined the Cantonese movement. There is no finding by the court that plaintiff's services were ineffective but the court did find that plaintiff did in fact render valuable services.

If defendant is correct in its views that the record discloses plaintiff's compensation was to be upon the "differential" basis nevertheless plaintiff is entitled to compensation for the reasonable value of his services. Defendant lowered the price of its airplanes and contends that thereby the "differential" was eliminated and that with the "differential" went also plaintiff's compensation. It would be harsh and unjust to uphold this contention. The more just and reasonable rule is that, if the seller changes the fixed price so that the agreement can no longer operate, the seller is obligated to

pay the reasonable value of the services rendered by the agent in furthering the consummation of the sale. ▮ A seller may not ratify the appointment of an agent to be compensated upon a ''differential'' basis, receive the benefit of his services, and at the moment of final negotiation make sure to itself the consummation of the transaction and full enjoyment of its profits by the expedient of lowering the price of the commodity and eliminating the compensation of the agent. In such a situation the agent is entitled to the reasonable value of his services. In *Wetzell* v. *Wagoner,* 41 Mo. App. 509, the owner offered to pay $200 commission if a farm should be sold for $8,000. The broker introduced to the owner a prospective customer to whom the farm was afterwards sold at a lower price. In holding that the broker was entitled to compensation the court said: ''It would indeed be a singular hardship on the plaintiffs if after their successful efforts in bringing about this sale they should receive no compensation, solely because the defendant agreed himself with the purchaser to take a less sum than he had offered, through the plaintiffs, his agents, to take in the first instance. It would be quite difficult to conceive of a principle that would give sanction to such rank injustice.'' (See, also, *Steinfeld* v. *Storm,* 31 Misc. 167 [63 N. Y. Supp. 966] ; *Raeder* v. *Butler,* 19 Pa. Sup. Ct. 604; *In re Breon Lumber Co.,* 181 Fed. 909.)

The judgment is reversed.

Crail, P. J., concurred.

McComb, J., dissented. .

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 13, 1937, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 17, 1938.