CHARLES H. SWAFFORD, d/b/a SWAFFORD ICE CREAM
COMPANY *v.* SEALTEST FOODS DIVISION OF
NATIONAL DAIRY PRODUCTS CORPORATION

5-5920                                        483 S.W. 2d 202

Opinion delivered July 24, 1972

[Rehearing denied August 28, 1972.]

*Gannaway, Darrow & Hanshaw,* for appellant.

*Smith, Williams, Friday, Eldredge & Clark,* for appellee.

CARLTON HARRIS, Chief Justice. Appellant, Charles H. Swafford D/B/A Swafford Ice Cream Company, instituted suit against appellee, Sealtest Foods Division of National Dairy Products Corporation, hereafter called Sealtest, wherein he contended that he had served that company under an agreement entered into between the parties, as its distributor of ice cream products within its sales area in Arkansas from January 1, 1967, to September 30, 1967; that appellee had agreed to pay him a 12% commission on the gross sales in the sales area, in addition to a 10% commission which he received as a sub-distributor, but had refused to do so; that he was due under the agreement the sum of $52,963.34 and judgment was sought in that amount, plus interest, from the September 30 date. Sealtest answered with a general denial and then counterclaimed in the amount of $9,002.96 which sum was alleged to be due appellee on appellant's open account.[1]. Subsequently, appellee also asserted that Swafford was estopped from relying on the contract as he had operated under the agreement without demand for the additional commission; also, it was asserted that the alleged agreement was void under the statute of frauds and for lack of mutuality. Thereafter, the case proceeded to trial, and the jury returned a verdict for appellant in the amount of $35,000, and found against appellee on its counterclaim. However, appellee filed a motion for judgment *non obstante veredicto* as to its counterclaim, and the court granted this motion. Likewise, the court denied interest to appellant on the recovery from September 30, 1967, allowing interest only from the date of the judgment. From that portion of the judgment granting appellee a judgment n.o.v. and from that portion denying interest prior to judgment appellant brings this appeal. Appellee cross appeals from that portion of the judgment entered against it. We first discuss the cross appeal wherein appellee asserts that its motion for directed verdict should have been granted because no legally binding contract was created as a matter of law.

There is no dispute but that the parties entered into an agreement for Swafford to take on extra duties commenc-

---

[1]Appellant was required to purchase the dairy products from the Sealtest office in Memphis.

ing May 1, 1966, and this was supported by a written memorandum. William T. Nichols of Memphis, General Manager for Sealtest for the Memphis district, testified that the company did not feel that Harry Earhart, distributor for Sealtest in Arkansas, was spending as much time in selling as he should, and that Earhart owed the company something over $20,000. Earhart contacted Nichols, stating that he wanted to bring Swafford with him to discuss the matter, and at this meeting, Earhart suggested that Swafford take over the greater part of his duties as distributor and stated that he would split his commission with Swafford, the latter to draw 6% and the 6% which would go to Earhart would be given the company to apply on his account. Nichols said that this met with his approval but such agreement was to be in effect only until December 31, 1966; that thereafter Swafford would resume his duties strictly as sub-distributor and the company office would handle the sales contracts out of Memphis. Swafford's testimony was in substantial agreement with Nichols' testimony as to the arrangement through December 31, 1966, but he contended that he was then on the basis of an oral agreement, to take over entirely as distributor, performing all of the duties of a distributor and his version was supported by Earhart.

It is first argued that the contract was not binding because essential terms had been omitted. The fact that there was no definite time period fixed, and that there seems to have been no definite agreement as to paying rebates to customers, are *inter alia* mentioned. Several cases are cited by appellee in support of this argument. But we do not agree that these cases are in point for they either involved damages following an alleged breach of contract which occasioned loss of profits, a failure to recoup expenses incurred in anticipation of performance of a contract, or related to specific performance of a contract. Essentially the cases involve the inability to perform the unexecuted portion of a contract, while in the present litigation, the recovery sought is based upon the executed portion of the contract. Appellee argues that the agreement relied upon by appellant is vague and uncertain, but this does not necessarily mean that such a

contract is a nullity, as the actions of the parties in carrying out the agreement can provide an index to the meaning of the contract. In *Beasley* v. *Boren,* 210 Ark. 608, 197 S W. 2d 287, this court said:

> "The provision in the lease for its renewal was indefinite because it failed to fix the rental to be paid during the additional term. But, because a contract is uncertain in its terms, it does not necessarily follow that it is a nullity. The parties to a contract may, by their mutual actions in carrying it out, furnish an index to its meaning, which the language thereof fails to do. After all, the written instrument is but an evidence of what the signers thereof propose to bind themselves to do, and when, by their conduct in carrying out the agreement, both of the parties to the contract demonstrate an intention to heal an uncertainty in the contract, the courts will generally adopt this practical construction. [citing cases]"

The court then quotes with approval from 12 Am. Jur. 558 as follows:

> "An uncertain agreement may be so supplemented by subsequent acts, agreements, or declarations of the parties as to make it certain and valid. The acts of practical construction placed upon a contract by the parties thereto are binding and may be resorted to relieve it from doubt and uncertainty. *The objection of indefiniteness may be* obviated by performance and acceptance of performance."

The basic difference between the parties is that Swafford contends that under the agreement he was to act, and did act, as distributor while Sealtest contends that he only acted as a sub-distributor. Perhaps at this point it would be well to mention some of the duties of these two positions. According to Nichols, a distributor had total responsibility for ice cream sales for the state of Arkansas. This included selling, administration, seeing that the product was delivered, seeing about the rotation of products, and seeing that adequate flavors were stocked. He was responsible for both new accounts and old accounts. Nichols said

that on the store level, the duties of a distributor and sub-distributor would be the same, the latter being responsible for the delivery of the merchandise and stocking of flavors. Earhart testified that his duties included maintaining good relations between the accounts and the company, and handling any kind of a problem that might arise. If a customer became dissatisfied with Sealtest products, he would call on that customer and if the customer wanted to change the account from one brand to another, it was the distributor's job to convince him that the company would do the customer a better job, and that it was to the customer's interest to remain with Sealtest products. With regard to sales, Earhart stated that he had to call on the accounts, and promote sales. As previously stated, appellee contends that after Earhart left its employment, there was no distributor, all the duties being handled by sub-distributors (of which Swafford was one), and sales were to be handled by the Memphis office, while Swafford contends that he handled both duties. Witnesses offered on behalf of appellant included Earhart, Darrell Maxwell, operator of a super market at Brinkley, Richard Leak, a grocer at Forrest City, James Hoyt, a grocer at Forrest City, W. J. Reed, who operates a super market at Pine Bluff, W. E. Steed, Jr., who operates a grocery at Pine Bluff, Jim Carruth, a grocery employee at Marianna, Johnny Ramsey, assistant grocery manager at Weingarten's at North Little Rock, Paul Hannah, who drove a truck for Swafford for a time in 1966, and Ralph Roberts, with K-Mart Foods Store in Little Rock. Five witnesses testified on behalf of appellee, but four of these were employed or closely connected with Sealtest. Appellant's witnesses all testified that his duties apparently changed after they originally dealt with him. According to the testimony, when Swafford first began to call on them, he drove the ice cream truck himself and actually delivered the product; subsequently however, other drivers took over and delivered the product and Swafford would just call on them. Nearly all mentioned that originally, as a truck driver, he wore khaki work clothes, but that after he stopped driving the truck, and started making calls on these customers, he would be dressed in a business suit. Frequently, he would be checking on the man who had been doing the delivering. Some testified that he brought promotional materials by

the stores and a large number of the witnesses definitely were of the view that Swafford had taken Earhart's place as distributor. The President of the Razorback Store Group in Pine Bluff testified that Swafford was depended upon for promotion of the products and that he frequently made long distance calls to Swafford about promotional deals. There is no doubt from the evidence that Swafford handled different duties, mainly supervisory duties, which he did not handle while acting solely as a subdistributor. Certainly, there was ample evidence, based on the actions of the parties, to submit to the jury the question of whether the parties were acting under a contract.

It is also asserted that the contract was void and unenforceable under the statute of frauds because of the fact that there was no agreement that the contract was to be performed within one year. See Ark. Stat. Ann. § 38-101 (Repl. 1962). While it is true that an oral contract for personal services in excess of one year is void, and that part performance will not remove such contract from the operation of the statute of frauds, it is also true that the employer will be liable for whatever service was rendered. In *Bald Knob Special School District* v. *McDonald,* 171 Ark. 72, 283 S.W. 22, this court said:

> The question of liability under such a contract partially performed is the same as that of liability under a verbal contract for any other personal services, which is governed by the Statute of Frauds, and this court has held that partial performance of a contract for personal services does not take a verbal contract out of the operation of the Statute of Frauds except to the extent of imposing liability for that part which was performed. [citing cases]"

In the case now before us, Swafford is only contending for monies due him upon the *executed portion* of the agreement, i.e., from January 1, 1967, through September 30, 1967, and appellee's contention is without merit.

It is also asserted in the alternative, that the parties were not bound to perform for any specified length of

time; that Swafford could have ceased paying for the products, and that Sealtest could have ceased supplying the products, and that the agreement was therefore void for a lack of mutuality. Here again, appellee fails to take cognizance of the fact that this litigation is based upon the executed portion of the alleged contract. In *International Shoe Company* v. *King,* 186 Ark. 799, 56 S. W. 2d 171, this court said:

> "Appellant also contends for a reversal of the judgment because, even though the contract was made with authority, it was not mutual, and therefore not binding on appellant. The argument is made that the contract did not attempt to bind appellee to buy shoes in any definite quantities for any definite length of time, and to buy them exclusively from appellant. Appellant requested two instructions, Nos. 5 and 6, on mutuality of contracts, which the court refused to give. The doctrine of mutuality of contracts is not applicable, *in so far as same have been executed or operated under.* [our emphasis] *El Dorado Ice & Planing Mill* v. *Kinard,* 96 Ark. 184, 131 S. W. 460; *Weil* v. *Chicago Pneumatic Tool Company,* 138 Ark. 534, 212 S. W. 313. It was not error to refuse instructions touching the question of the necessity of mutuality of contracts, *same not being applicable to executed contracts* [our emphasis]."

We come now to the question of whether interest should have been allowed from September 30, 1967, rather than from the date of judgment. Appellee argues that the claim was clearly for an unliquidated amount and there were too many uncertainties for the amount due to be readily ascertainable. It is mentioned that there was quite a bit of evidence about the paying of rebates and appellee states that under the asserted contract by Swafford, he was due to pay these rebates, but did not do so; it is pointed out that Sealtest, on the basis of an estimate, established the amount of rebates which it paid from January 1, 1967, through September 30, such rebates amounting to approximately $23,700.[2]

---

2. Swafford testified to paying some rebates but he did not furnish the amount.

We are unable to agree with Sealtest in its argument. It may well be that this amount of rebates was considered by the jury in reducing the amount sought in appellant's complaint from $52,963.34 to $35,000, since the jury was instructed relative to rebates. Be that as it may, according to Sealtest, it knew what the rebates that it had paid amounted to, and it could have deducted this amount before tendering payment to Swafford. This is not a case wherein appellant demanded one sum and appellee countered with the offer of another sum; rather, Sealtest took the position that it did not owe Swafford any amount. In *Norton* v. *Hickingbottom*, 212 Ark. 581, 206 S.W. 2d 777, Hickingbottom, a building contractor, sued Norton and wife for amounts due him for alleged extra work involving alterations of a building contract. The complaint asserted that the value of the extra work was $792.75 and demand was made for that amount. A cross complaint was filed alleging that Hickingbottom had failed to substantially perform his contract. On trial, the jury returned a verdict for $347.69 and the court granted interest on that amount at the rate of 6% from the date of termination of the relationship between the parties. On appeal, it was contended that since the debt found to be due was not a liquidated demand, interest could not be had prior to a determination of the value of the services. This court did not agree with that argument, holding that, despite the fact that it was not asserted that the agreement was for a particular sum, the jury finding that Hickingbottom was entitled to $347.69 at the conclusion of the contract, meant that payment should have been made to him at that time and the court accordingly did not err in adding interest. In *Loomis* v. *Loomis*, 221 Ark. 743, 255 S. W. 2d 671, it was pointed out that the rule that interest is not allowed on unliquidated demands does not mean that the party seeking interest must in every instance know before the trial the exact amount he must pay if he loses. It is then stated:

> "The rule applies principally to those cases in which the defendant is not in default for the reason that the extent of his liability can be determined only by litigation, as in a suit for personal injuries or for recovery upon *quantum meruit.* [citing cases]"

The court then cited the case of *Rogers* v. *Yarnell*, 51 Ark. 198, 10 S. W. 622, stating:

"There a mutual account between the parties had extended over a period of thirteen years before coming to an end in 1884. The account was so involved that a master was appointed to arrive at the net balance due either to the plaintiff or to the defendant. Judge Cockrill carefully explained why interest is not allowed upon each item in such an account, but in remanding the case in 1888 we directed that the master determine the correct balance and allow interest on the balance so found from January 1, 1885. The latter date was evidently that on which the losing party could be said to be in default, although the amount of his liability was determined only after prolonged litigation."

In the more recent case of *Wright* v. *Rochner*, 233 Ark. 50, 342 S. W. 2d 483, there were many conflicting contentions, various loans, advances, repayments, etc., over a period of two years, and as in the case before us, the question was whether there was substantial evidence to support the jury's verdict. In addition, the question of awarding of interest by the trial court was appealed to this court. We stated:

"In entering the judgment the court below allowed the amount of the jury verdict and in addition thereto awarded interest from December 8, 1958, the date on which the last of the soy beans were sold by Wright to Rollison. Appellants question the right of the court to award interest from that date and argue that interest should run only from the date of judgment. The record is silent as to whether the jury in its verdict included interest as a part of the award and there was no instruction ordering them to do so. In the absence of a showing that interest was included in the jury verdict, we cannot say the court's addition of interest was error. As we said above, there was substantial evidence on which the jury could base the verdict returned. [citing cases]. One who has had the use of another's money may justly be required to

pay interest from the time it lawfully should have been paid. [citing cases]"

According to the jury verdict, Sealtest had the use of $35,000, which really belonged to Swafford, from September 30, 1967, and under this finding, and our cases, Swafford was entitled to the legal return of interest on this money from that time. Accordingly, the court erred in refusing to award interest.

Finally, we proceed to discuss the judgment n.o.v. granted by the court. As has already been mentioned, Sealtest, following the institution of the complaint by Swafford, filed a counterclaim in the amount of $9,002.96, such amount alleged to be due on an open account. The jury found against Sealtest on this counterclaim, returning a judgment for appellant. The court however subsequently allowed the amount sought, and appellant contends that this was error. Proof on this point was far from satisfactory. To support its contention, Sealtest offered two exhibits and the testimony of John Gardner, who had been controller at the time of the events at issue. One of these exhibits was an open account described by Gardner as "account receivable" statement. Gardner attempted to explain his knowledge of the correctness of the account at $9,002.96, by saying that ice cream is loaded out to the distributors or subdistributors on the basis of a load sheet. Each such sheet was then sent to the computer system and keypunched, and a charge which came back on a sheet formed the basis for charges to the distributor's account. The witness said that he checked each load sheet against the statement, and thereby concluded that the balance stated was correct. No accounting was given by the witness for credits, except for Gardner's explanation that he had with him certain delivery tickets which related to credits in some ambiguous way seeming to relate either to merchandise returned by a distributor's customer or to credits to the distributor or subdistributor for deliveries acknowledged by these customers. No mention was made by Gardner of payments made by Swafford or of the accuracy of the loading tickets which formed the basis of the charges, though appellant denied owing the company.

These statements were certainly admissible as business records under Ark. Stat. Ann. § 28-928 (Repl. 1962), but they were in no sense of the word conclusive evidence of the correctness of the account under the statute. The circumstances of the making of these records had a bearing upon the weight to be given them by the jury, as did Gardner's lack of personal knowledge of their accuracy. In addition, though Swafford had terminated his employment in September, Gardner said that he covered a period through November 8 to be sure appellant received credit for any ice cream that he had on hand; however, it does not appear that any credits were given after October 28, although charges were added through November 8. The other exhibit offered was a series of IBM sheets and various ledger sheets and this exhibit is completely confusing. There are 37 IBM sheets and a number of these show handwritten changes, i.e., in several instances the machine totals are scratched out and a different figure inserted by hand.[3] Also, the IBM sheets do not begin until the week of June 3, approximately four months before Swafford terminated his employment, though it is contended in the counterclaim that the transactions creating the indebtedness covered a period of several years. The total amount due under the IBM sheets is $9,793.63 but there is a machine notation on the last sheet, as of December 28, "write off". Unquestionably, the exhibits are confusing, and not in accord with each other. Appellant offered evidence of shortages in the ice cream purchased from Sealtest, but this was not reduced to the monetary value. Swafford's testimony that, on numerous occasions during 1966 and 1967, the merchandise charged to him was not actually loaded out by Sealtest, that his complaints about this were ignored, that when he was driving a truck and picked up the merchandise himself there were frequent shortages varying from five to 50 gallons, and that he never received credit for any shortage, was not contradicted by any witness, even though the one to whom Swafford said he complained testified at the trial. J. M. Spencer, a driver for Swafford, testified that on one occasion there was a shortage of 90 gallons, and on others

3. Swafford testified that the store sales manager of the Memphis office, Wayne Parker, told him in April that the company was in process of going to IBM, and that it was quite a headache.

from two to ten gallons. It was stipulated that Paul Hannah would give the same type of testimony as that given by Spencer.

Let it be borne in mind that the granting of a judgment n.o.v. is only proper where there is no substantial evidence to support the verdict. In other words, as pointed out in *Spink* v. *Mourton*, 235 Ark. 919, 362 S. W. 2d 665, the motion for judgment n.o.v. is properly denied unless it can be said that the trial court should have directed a verdict in favor of the party receiving the n.o.v. judgment. This court said:

> "Now it is true that the trial judge might have granted a new trial if he found the verdict to be against the preponderance of the evidence. *Bockman* v. *World Ins. Co.,* 222 Ark. 877, 263 S. W. 2d 486. But this case does not involve a motion for a new trial; instead, the request was for a judgment notwithstanding the verdict. Such a motion may be granted if there is no substantial evidence to support the verdict. *Stanton* v. *Ark. Democrat Co.,* 194 Ark. 135, 106 S. W. 2d 584. In other words, as counsel for the Spinks rightly concedes in his brief, the motion for judgment n.o.v. was properly denied unless it can be said that the trial court should have directed a verdict in favor of the plaintiffs. That is the issue. Owing to the fact that the plaintiff has the burden of the proof—that is, the burden of persuading the jury that he is entitled to win the case—a directed verdict for the plaintiff is a rarity. As we said in *Woodmen of the World Life Ins. Soc.* v. *Reese,* 206 Ark. 530, 176 S. W. 2d 708: 'A verdict upon an issue of fact should not be directed in favor of the party who has the burden of proof with respect thereto, unless such fact is admitted, or is established by the *undisputed* [4a] testimony of one or more *disinterested*[4b] conclusions from such testimony.''

Later in *Beard* v. *Coggins,* 249 Ark. 518, 459 S. W. 2d 791, we had this to say:

---

[4a.-4b.] Our emphasis.

"Appellant insists that a judgment notwithstanding the verdict should have been granted. Such a judgment is appropriate only if it can be said that the trial court should have directed a verdict in favor of of the plaintiff (appellant), which is a rarity. *Spink* v. *Mourton,* 235 Ark. 919, 362 S.W. 2d 665 (1962). In testing the sufficiency of the evidence on a motion for a directed verdict the testimony and all reasonable inferences are viewed in the light most favorable to the party against whom the verdict is sought. *Page* v. *Boyd-Bilt, Inc.,* 246 Ark. 352, 438 S. W. 2d 307 (1969). \*\*\*

\*\*\*As to the substantiality of the evidence we cannot disturb the jury's conclusion 'unless we can say there is no reasonable probability in favor of appellee's version, and then only after giving legitimate effect to the presumption in favor of the jury findings.' *Mc-Williams* v. *R & T Transport, Inc.,* 245 Ark. 882, 435 S.W. 2d 98 (1968)."

Of course, Gardner's testimony cannot be considered as uncontradicted, both because of his position with the company and because of his lack of personal knowledge, and thus appellee was not entitled to either a directed verdict or a judgment n.o.v. Apparently, because of the conflicts and inconsistencies, the jury placed no confidence in the exhibits offered, and we certainly cannot say that they were required to accept the accuracy of either exhibit. The accuracy of both could not have been accepted since they were incompatible. We conclude that the jury verdict should not have been disturbed, and the court erred in awarding the judgment n.o.v.

In accordance with what has been said, the judgment on direct appeal is reversed; the judgment on cross-appeal is affirmed; and the cause is remanded to the Pulaski Circuit Court with directions to enter a judgment consistent with this opinion.

It is so ordered.