**CHARLOTTE AIRCRAFT CORPORATION, a corporation, Appellee,**

v.

**PURDUE AIRLINES, INC., a corporation, and Stephens, Inc., a corporation, Appellants.**

No. 73-1831.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1974.

Decided June 7, 1974.

Rehearing Denied July 2, 1974.

John C. Calhoun, Jr., Little Rock, Ark., for appellants.

Thomas E. Downie, Little Rock, Ark., for appellee.

Before VOGEL, Senior Circuit Judge, and LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Charlotte Aircraft Corporation brought suit against Purdue Airlines, Inc., and its principal stockholder, Stephens, Inc., to recover a commission allegedly due for its efforts in arranging the sale of a DC–9 jet aircraft from Purdue Airlines to Inex Adria, a Yugoslavian airline. The trial court awarded plaintiff a commission of 3¾% on the sale price resulting in a judgment of $160,683.27, with prejudgment interest at the rate of 6% per annum. The defendants appeal. We affirm the judgment of the district court.

A brief analysis of the facts set forth in the district court is necessary.

Purdue Airlines was a private supplemental air carrier associated with Purdue University in Lafayette, Indiana. In 1969, Purdue purchased and placed in use two DC–9 jet aircraft. It was unable to realize a profit on the operation of these aircraft, however, and by early 1971, it had decided to dispose of them.

Charlotte Aircraft Corporation is a North Carolina corporation specializing in the purchase and sale of aircraft and aircraft parts. When it became known in the airline industry that Purdue had placed its planes on the market, Harold Caldwell, the principal shareholder of Charlotte and its president, began a series of contacts with Purdue through the Stephens company which was handling the sale of the planes. On February 19, 1971, Caldwell wrote Purdue that he wanted his company to act as agent in the sale of the aircraft, and quoted a commission of 2½%. On April 21, 1971, Caldwell sent a telegram to Purdue quoting specific prices for the planes of $3,900,000 and $4,000,000 and asking any sums in excess of these prices as his commission. This telegram named Inex Adria as the potential buyer. On April 23, Stephens responded by agreeing to those terms.

Thomas Braun and Badr Halwany, joint venturers with Charlotte Aircraft, had been responsible for the initial contact with Inex Adria and, while in Yugoslavia in late April of 1971, they had entered into two tentative, alternate contracts with Inex. One of the contracts was a long-term lease agreement and the other provided for the purchase of a single aircraft, an extra engine and spare parts for $4,445,000. Prior to the execution of these agreements, Braun had received a letter from Inex expressing interest in arranging a purchase of one aircraft alone for $4,200,000. On April 25, Caldwell arranged a meeting in Miami, Florida, between officials of Stephens, Braun and Halwany, and himself to discuss the Inex proposals. After arriving in Miami but before the meeting with Braun and Halwany, Stephens, Inc., executed an agreement appointing

Charlotte Aircraft its exclusive agent in any dealings with Inex. This agreement contained no mention of compensation.

After the meeting in Miami, relations between the personnel from Stephens and Caldwell and his partners became increasingly strained. Stephens was not attracted by the possibility of a sale to a foreign airline on credit terms and Inex Adria could not afford a cash transaction. Nonetheless, Caldwell flew to New York to attempt to arrange some form of independent financing. These negotiations were begun with two alternatives in mind: (1) a purchase by Inex financed independently from Purdue, or (2) a purchase by Charlotte for resale to Inex. Toward this latter possibility, Caldwell had secured a short-term option to purchase both planes at a very reasonable price before leaving Miami.

On May 6, one of the principals of Inex Adria contacted Mr. Millwee of Stephens, Inc., directly and asked for a meeting apart from the Charlotte group. At this meeting, it was agreed to arrange the sale without the further assistance of Charlotte. Charlotte was thereafter denied participation in the negotiations. The plane was eventually sold to Inex for the sum of $3,900,000. An extra engine and a quantity of spare parts were also sold. On January 7, 1972, Charlotte made formal demand upon the plaintiff for 5% of the total purchase price of $4,322,189.00 (Purdue's agreed price with Inex on the plane and parts) or $216,109.45. When this demand was refused this action was filed.

In the course of its memorandum opinion, the district court made the following specific factual findings:

That a valid, binding exclusive agency contract was in existence; that there had been no express agreement as to commission but that the defendants impliedly agreed to pay a reasonable sum; that no attempt was made to revoke this exclusive agency; that Stephens agreed with Inex to bypass Charlotte as its agent; that Purdue was unaware of the terms arranged by Braun and Halwany for the sale of the aircraft but that Charlotte was under no obligation to reveal those terms since it was also interested as a potential buyer; and that a reasonable commission would be 3¾% of the actual price realized by Purdue in the sale of the plane.

The defendants urge on appeal:

(1) That if a commission is due, it must be figured in accordance with the "net price" arrangement of the original agreement formed by the telegrams of April 21 and April 23, 1971;

(2) That plaintiff violated its fiduciary duty by acting as both seller and purchaser;

(3) That there was no factual basis for placing the commission at 3¾%; and

(4) That prejudgment interest should be denied since the debt was not liquidated.

*The Net Price Listing*

On appeal the defendants argue that the district court erred in awarding any commission on the sale since the listing was a "net price" listing at a price of $3,900,000.[1] Since the plane was ultimately sold for exactly that price, Purdue reasons, no commission was due. The defendants' insistence that a net price listing had been made was based upon an exchange of telegrams between the parties in April, 1971.[2]

---

1. A net price listing is one in which the seller places the property for sale with the agreement that he will accept a certain sum and the agent's commission will be all sums in excess of that amount. *See* Lane v. Smith, 179 Ark. 533, 17 S.W.2d 319 (1929).

2. On April 21, 1971, Charlotte wired Purdue the following:

Charlotte Aircraft's customer, Inex Adria Airways of Yugoslavia, is prepared to buy one or two DC-9-32's along with spare engines and parts. CAC's commission on the sale is all monies over and above $3,900,000 on aircraft # N393 and all monies over $4,000,000 on aircraft # N394 and 10% on the sales price of any parts and spare engines sold to Inex

The exclusive agency agreement was executed by the parties on April 25, 1971, two days after this exchange. It contained no mention of the amount of commission which would be earned upon sale. The district court found, in the absence of any specific terms relating to a commission, that there existed an implied agreement "that the plaintiff would be paid a reasonable fee based upon the work and services performed by the plaintiff in accordance with the customs and standards prevailing in the industry of buying and selling transport-type aircraft." The court additionally noted: "The results reached by the Court, however, would not be different had the Court found no exclusive agency agreement but was proceeding simply upon a *quantum meruit* theory."

██ It is urged by the defendants that the net price agreement accepted by Purdue on April 23, 1971, became a part of the exclusive agency agreement of April 25, 1971. Even if this be true, however, the defendants conveniently ignore the fact that they excluded Charlotte's interests when they agreed upon the final sale price of the plane. The defendants would argue that a seller may place property for sale with an agent on a net price basis, thereafter exclude the agent from the negotiations leading to a sale, and then sell at net or below net price and avoid the obligation to pay a commission. We agree with the plaintiff that this would be a harsh and unjust rule to invoke. It is the law in Arkansas as elsewhere that when property that is subject to an exclusive agency agreement is sold, the broker is entitled to a commission even though the sale is made without his assistance. *See* Halbert v. Block-Meeks Realty Co., 227 Ark. 246, 297 S.W.2d 924 (1957). Dealing with a similar "net price contract," a California appeals court observed in

Adria Airways during the next twenty four months for DC–9 type equipment.
Purdue replied on April 23, 1971:
We agree to accept $3,900,000 for DC–9–32 N393 PA and/or $4,000,000 for DC–9–32 N394PA net to Purdue Airlines Inc. F O

Hall v. Douglas Aircraft Co., 23 Cal. App.2d 498, 73 P.2d 668 (1937):

The more just and reasonable rule is that, if the seller changes the fixed price so that the agreement can no longer operate, the seller is obligated to pay the reasonable value of the services rendered by the agent in furthering the consummation of the sale. *Id.* at 673.

We agree.

*The Commission*

The defendants also assert that the commission awarded by the district court is excessive. In the early stages of their dealings together, Charlotte had indicated that it would accept a commission of 2½% upon the sale of the plane in question. The defendants argue that this is the best evidence of a reasonable commission since the plaintiff actually offered to work for that amount. Charlotte answers that the figure of 2½% was mentioned in contemplation of a relatively simple sale to a domestic American or Canadian airline and that the sale to Inex required substantially more effort on its part, justifying a higher commission. The evidence received by the court consisted of the following:

(1) The contents of a letter from Harold Caldwell to Purdue officials dated February 19, 1971. The body of the letter said simply:

We have quoted your DC9–32 aircraft to Air Canada and Delta Airlines and, in accordance with our past discussions, would expect a commission of 2.5% of the gross dollar volume in event of sale or trade.

(2) The testimony of Harold Caldwell to the effect that:

(a) His firm had gross sales of 25 million dollars in 1971 and earned commissions of 1 million dollars.

B Lafayette, Indiana in present condition subject to warranties still in effect from original manufacturers with current air wotxxx [sic] worthiness certificates subject to prior sale.

(b) That when financing is not involved and there are no sub-agents, a 2½% commission is customary.

(c) That more expense is involved in a foreign deal.

(3) The testimony of Jordan Greene, an attorney specializing in aviation sales, who said:

(a) That in a sale involving sub-agents, the normal commission would be at least 5%.

(b) That when financing is not involved, many sales are made for a commission of less than 5%.

. (4) The testimony of Lawrence Levine, another attorney specializing in aircraft deals, who testified that the minimum commission in cases where the agent brings the parties together and arranges financing, whether that financing is used or not, is 5% and could go as high as 8%.

█ On the basis of the evidence adduced we find sufficient proof to sustain the district court's award of 3¾% as a reasonable commission. At least, we cannot say on the present record that the finding is clearly erroneous.

*Fiduciary Duty*

It is urged that the plaintiff violated its fiduciary duty in failing to disclose that it planned to purchase the aircraft at Purdue's asking price ($3,900,000 or below) and resell the plane to Inex for $4,200,000. The record indicates that Charlotte contemplated this course of dealing because Inex was having difficulty in making a cash transaction and as a foreign concern was considered a poor credit risk. The district court found that Charlotte was under no obligation to Purdue in this situation to reveal Inex's tentative offer to purchase the plane for $4,200,000. We must respectfully disagree.

█ Section 390 of the Restatement (Second) of Agency provides:

An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them.

We find that Charlotte did owe a duty of full disclosure when negotiating on its own behalf and that it failed in this duty. As stated in Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co., 160 F.2d 721 (7th Cir. 1947):

"The rule well established in equity is that the relation existing between a principal and agent for the sale of property is a fiduciary one, and the agent, in the exercise of good faith, is bound to keep his principal informed on all matters that may come to his knowledge pertaining to the subject matter of the agency. He may not *purchase* (our emphasis) his principal's property except upon the fullest disclosure of all matters within his knowledge which may affect its value. * * * This is the general rule." *Id.* at 725.

*See also* Greer v. Craig, 165 Ark. 209, 263 S.W. 400 (1924). *Cf.* Gessleman v. Phillips, 110 Neb. 416, 193 N.W. 750 (1923). However, this failure did not give the defendants the right to bypass Charlotte in the final negotiations. *See* Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co., *supra.* It is significant here that Charlotte did not go through with the action contemplated. It did not, in fact, purchase the property. *Cf.* Pitzer & Smith v. Pittman, 253 S.W. 306 (Tex.Civ.App.1923).

█ The defendants also urge that Charlotte breached its duty generally, apart from any intention to purchase the plane itself, by failing to inform them that Inex was willing to pay $4,200,000 for the plane. This we agree was information that should have been disclosed by Charlotte, acting as agent. *See* Restatement (Second) of Agency §

381. *See also* Seavey, Agency § 143. However, the record does not support the finding that Charlotte breached its duty in this respect. The testimony of the defendants' witness Robert Millwee was to the effect that he sought the information for the first time in Washington on the morning of May 6, 1971, at which time it was refused. It is clear from his testimony, however, that he made his request in conjunction with a demand that Charlotte accept what it felt to be a reduced commission or suffer termination of its agency. In the afternoon of the same day, he testified, he was given the information. The only time, then, that the defendants expressed any interest in having the information, they coupled their request with an impermissible demand and, despite that, the information was ultimately given.

We conclude the only violation of fiduciary duty which occurred related to Charlotte's attempt to acquire the airplane for resale without disclosure of the existing offer from Inex. However, Charlotte did not acquire the aircraft and its mere contemplation of this action could not have constituted a basis for refusing to award the commission.

*Prejudgment Interest*

█ The district court awarded the plaintiff a commission of 3¾% with interest on the judgment "from January 7, 1972, at the rate of 6 per cent per annum as provided by law." January 7, 1972, is the date on which Charlotte submitted a bill for its services. That bill claimed a commission of 5% for a dollar amount which exceeded the award of the court by $55,426.18. The defendants argue that prejudgment interest should not have been awarded because the claim involved was unliquidated and could not have been ascertained from the face of the agreement nor by reference to a well-established market value before judgment.

The Arkansas Supreme Court has recognized in Loomis v. Loomis, 221 Ark. 743, 255 S.W.2d 671 (1953):

The familiar rule that interest is not allowed on unliquidated demands does not mean that the defendant must in every instance know before the trial the exact amount he must pay if he loses.

*Id.* at 673.

In White & Black Rivers Bridge Co. v. Vaughan, 183 Ark. 450, 36 S.W.2d 672 (1931), an attorney brought an action to recover legal fees for services rendered. He sought $3,823.58 and received a verdict for $2,750.00 plus interest from the date on which he had first demanded payment. The Arkansas court's discussion strongly indicates that interest was properly allowable in the present case. In approving the award of prejudgment interest the Arkansas court observed:

In Prager v. New Jersey Fidelity & Plate Glass Ins. Co., 245 N.Y. 1, 156 N.E. 76, 52 A.L.R. 193, it was held that a claim for legal services resting on quantum meruit draws interest to be computed from the date of the demand. It was further held that a demand for compensation for legal services on quantum meruit greatly in excess of the amount determined to be due does not prevent the adding of interest to the award. The opinion in that case is very comprehensive, and in a case note on page 197 of 52 A.L.R., it is stated as a general rule that interest on a claim for legal services is recoverable from the time it becomes due and payable and that this is the time when the demand for payment is made.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅

Again in Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265, the court said that one who has had the use of money owing to another may justly be required to pay interest from the time it lawfully should have been paid.

*Id.* at 675.

*See also* Swafford v. Sealtest Foods, 252 Ark. 1182, 483 S.W.2d 202 (1972).

Judgment affirmed.