In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2362 & 99-3053

Eastern Trading Company, et al.,

Plaintiffs-Appellants, Cross-Appellees,

v.

Refco, Inc., and Refco Capital Corporation,

Defendants-Appellees, Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 6815--Suzanne B. Conlon, Judge.

Argued February 24, 2000--Decided October 10, 2000

Before Cudahy, Posner, and Evans, Circuit Judges.

Posner, Circuit Judge. Eastern Trading Company, a partnership located in Dubai that trades gold and silver bullion in large quantities, brought this suit against two commonly owned corporations--Refco, Inc., a Chicago commodities broker, and Refco Capital Corporation-- charging fraud and related misconduct in violation of the Commodity Exchange Act, 7 U.S.C. sec.sec. 1a et seq., and the common law of Illinois. The defendants counterclaimed for breach of contract. The jury brought in a verdict for the defendants on the main claim and a judgment for Refco, Inc. of $14 million on the counterclaim, the judge having dismissed Refco Capital Corporation as a counterclaimant before the trial. Eastern appeals. Refco (as we'll refer to Refco, Inc., the broker, except when discussing its affiliate) cross-appeals, seeking an award of attorneys' fees, as provided for in its commodity trading contract with Eastern, the basis for the successful counterclaim. The issues that we need to resolve are primarily ones of general law rather than of anything peculiar to the Commodity Exchange Act or Illinois law. In view of the jury verdict, Refco gets the benefit of the doubt on disputable facts.

The partners in Eastern are Haji Ashraf and his four eldest sons. They are equal partners in the sense of sharing the profits of the partnership

equally. Although the firm does a substantial business, its offices consist of a single large room partitioned into separate cubicles for the partners by means of sliding glass doors. The partnership agreement authorizes each partner to sign contracts on behalf of the firm. The father is the chairman of the firm but during the period relevant to this case his eldest son, Zahid Ashraf, was the managing partner. Refco is represented in Dubai by a commodities broker called Ramada Financial Consultants that is owned and operated by a distant cousin of the Ashrafs named Zaheer Khawaja. Although Ramada is a "foreign correspondent" of Refco (the meaning of the term in this context is unclear), the contract between the two firms disclaims any intention of making Ramada an agent of Refco.

In January 1992 Eastern and Refco entered into a customer agreement by which Refco was to broker trades on U.S. commodities exchanges for Eastern. Eastern's trading account with Refco established pursuant to the agreement was nondiscretionary, meaning that Eastern was to make all the decisions on what trades to make and Refco was merely to execute them. The agreement authorized Zahid and two of his brothers (the three being identified as "general partners" in Eastern with Zahid also being designated "Managing Director") to act for Eastern and provided that "Refco may assume conclusively that all actions taken by and instructions from any one of the . . . named general partners have been properly taken or given pursuant to authority invested in them by all the partners in the Partnership."

At first the trades that Refco executed for Eastern involved options and futures contracts designed to hedge Eastern against unexpected changes in gold and silver prices between the time that it bought gold and silver and the time that it sold them. But after three years Zahid Ashraf began placing orders with Refco through Khawaja on behalf of Eastern for options and futures contracts in much greater quantities than required to hedge Eastern's bullion trading; in fact he was speculating, which is the opposite of hedging. And not for the first time. In 1994 he had opened a personal trading account (not an Eastern account) with another U.S. commodities broker, Republic Securities New York, through Khawaja. In March of the following year, at about the time that he started speculative trading through Khawaja and Refco, Zahid lost millions of dollars in his Republic account, which Republic liquidated. Zahid had funded that account from Eastern funds, and when his father got wind of this he forced Zahid to repay the money to Eastern and to promise never again to use Eastern's funds for commodities trading without

the permission of the other partners.

 The promise was not kept. In fact the trades that Zahid began making on Eastern's behalf after the Republic fiasco were ten times as large as any of the previous trades that Eastern had made. They were very risky; in three days in March, Eastern lost $22 million in trades at Zahid's direction executed by Refco. Refco was of course aware of the sudden and substantial increase in the scale and riskiness of Eastern's commodities trading and it also learned from Khawaja of Zahid's disastrous experience with Republic. But as the increase in scale translated into much larger commissions for Refco, and Eastern was a substantial and reputable firm and Zahid its managing partner, Refco was content.

 Refco mailed Eastern daily statements of the trading results of the previous day, and Ramada faxed similar statements ("recaps") to Eastern. Zahid's partners did not read any of these documents, however; they left everything to do with commodities trading to Zahid. At his request, Ramada began sending Eastern two sets of recaps, one reflecting routine hedging transactions and the other the new, speculative trading by Zahid. Zahid did not show these recaps to his partners--in fact he destroyed them. When one of Zahid's brothers visited Refco's chief operating officer, the latter didn't tell him about the dramatic change in the amount of trading in Eastern's account.

 Zahid informed Refco of a change in the mailing address of Eastern's account and also opened a separate account with Refco at the new address in Eastern's name and switched his speculative trading to that account. He did not consult his partners about either the change of the mailing address or the opening of the new account. He later opened still another account with Refco and switched his speculative trading to that account, again without consulting his partners. And he was no longer trading gold and silver futures and options. He was speculating in foreign currencies, at one point obtaining an exposure in British pound futures and options that exceeded $3 billion. Refco did not inform Zahid's partners of any of these developments.

 Beginning in May 1996, the account (Zahid's third Eastern account) began experiencing large trading losses which caused it to become undermargined; nevertheless Refco continued executing trades in it at Zahid's direction. Refco also allowed him to withdraw money from the other accounts, even though the third was now undermargined. When finally liquidated in July of 1996, that account had a debit balance of $28

million, which Refco, Inc., as a clearing broker, had to make good to the people on the other side of Eastern's commodities trades. To eliminate the debit, Refco Capital, without advising Eastern, Zahid, or Khawaja, lent Eastern that amount, which was deposited in Eastern's account with Refco, Inc. Although the loan was from Refco Capital, Eastern was asked to give, and gave, a promissory note for the amount of the loan to Refco, Inc., which assigned the note to Refco Capital. Eastern repaid half the borrowed amount to Refco, Inc., not to Refco Capital, the assignee, but refused to repay the rest, and Refco's counterclaim is for the remaining debit balance. As a result of the losses, Zahid was stripped of his partnership interest in Eastern.

So far as its own claim, that of fraud, is concerned, Eastern argues only that the judge should not have instructed the jury on Refco's defenses of ratification, estoppel, and mitigation (the parties focus on the first of these, and we can ignore the others, which the parties treat as synonyms for ratification), because there was no evidence of ratification and so the jury was confused. Eastern is right of course that a jury should not be instructed on a defense for which there is so little evidentiary support that no rational jury could accept the defense. E.g., United States v. Perez, 86 F.3d 735, 736 (7th Cir. 1996); Aerotronics, Inc. v. Pneumo Abex Corp., 62 F.3d 1053, 1065-66 (8th Cir. 1995); Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1297 (10th Cir. 1989). Such a defense should be excluded from the case altogether by a grant of partial summary judgment or by a partial directed verdict. Letting the jury consider it is just an invitation to jury lawlessness. But it doesn't follow from this that the jury's verdict must be set aside. The invitation isn't always taken. It cannot just be assumed that the jury must have been confused and therefore that the verdict is tainted, unreliable. It's not as if, here, the judge had failed to give an instruction to which Eastern was entitled, or had given an erroneous instruction. This is just a case of surplusage, where the only danger is confusion, and reversal requires a showing that the jury probably was confused. Griffin v. United States, 502 U.S. 46 (1991); Buhrmaster v. Overnite Transportation Co., 61 F.3d 461, 463-64 (6th Cir. 1995); Free v. Peters, 12 F.3d 700, 703 (7th Cir. 1993); Dwoskin v. Rollins, Inc., 634 F.2d 285, 292-95 (5th Cir. 1981); cf. Gile v. United Airlines, Inc., 213 F.3d 365, 374-75 (7th Cir. 2000); McCarthy v. Pennsylvania R.R., 156 F.2d 877, 882 (7th Cir. 1946); Lattimore v. Polaroid Corp., 99 F.3d 456, 468 (1st Cir. 1996). Buhrmaster suggests that such an error is harmless as a matter of law, 61 F.3d at 463-64,

implying that there is to be no inquiry into the likelihood that the jury was confused; that may go too far.

It is different when, as in Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 29-30 (1962), the jury is instructed on an erroneous theory of liability and there is no basis for determining whether it relied on that theory. Since the jury is to take the law as the judge instructs it, however erroneous the instruction is, an erroneous theory of liability supported by the facts is quite likely to commend itself to the jury. The presumption is reversed when, as in this case, the jury is instructed on a theory (here of defense, but that is immaterial) for which there is no evidence and which probably, therefore, it rejected.

Eastern argues that the jury was confused. The verdict states that Eastern first had notice of Zahid's fraud in July 1995, which is incorrect-- that was the date of the discovery of his fraud against Republic Securities. But if this shows confusion, still it is hard to see how it could be due to the erroneous instruction, which is about ratification rather than about notice. Anyway, since by July 1995 all of Zahid's trading was in Eastern's account in Refco, the jury may simply have determined that by then Eastern must (or should) have known about Zahid's unauthorized speculations.

We add that if Eastern had asked the district judge to submit to the jury an interrogatory on ratification, and the jury had checked the box for that defense, indicating that it agreed that Eastern had ratified the fraud committed by Refco, Eastern would then have had a solid basis for seeking a new trial (or further deliberations by the jury) if indeed there was no evidence of ratification. See Fed. R. Civ. P. 49; Abou-Khadra v. Mahshie, 4 F.3d 1071, 1082-83 (2d Cir. 1993); Chaney v. Falling Creek Metal Products, Inc., 906 F.2d 1304, 1308 (8th Cir. 1990); Foster v. Moore-McCormack Lines, Inc., 131 F.2d 907, 908 (2d Cir. 1942). Eastern did not do this, and so has only itself to blame for its inability to demonstrate that the jury was confused by the instruction.

In any event there was enough evidence to justify submitting a defense of ratification to the jury after all, although actually the case involves, as we'll see, a mixture of consent and ratification.

It is helpful to step back a bit and consider in commonsensical rather than technical legal terms the situation disclosed by the trial record. Zahid Ashraf had speculative fever, and although

he was speculating for the Eastern partnership rather than on his own account (as he had been doing through Republic Securities) he knew that his partners would disapprove and so he took steps with the aid of Ramada to conceal his speculative trades from them. This was a breach of his fiduciary duties to his partners, Restatement of Agency (Second) sec.sec. 381, 383, 385 (1957), and hence a fraud. In re Gerard, 548 N.E.2d 1051, 1059 (Ill. 1989); Doner v. Phoenix Joint Stock Land Bank, 45 N.E.2d 20, 24 (Ill. 1942); Conway v. Conners, 427 N.E.2d 1015, 1020 (Ill. App. 1981). True, he hoped that his partners, members of his family, would benefit along with himself (he would be entitled to one fifth of the partnership's profits from his trading). But what he did was still fraud, just as it is fraud to embezzle money from your employer for the purpose of gambling at the racetrack even though you expect to win and you intend when you do win to return to your employer more than you had "borrowed" from him. In other words, deliberately imposing risk can be a breach of fiduciary duty or a fraud. United States v. Catalfo, 64 F.3d 1070, 1077 (7th Cir. 1995); United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991); United States v. Dial, 757 F.2d 163, 170 (7th Cir. 1985). More fundamentally, motive does not equal intent; fraud, larceny, embezzlement, and the other financial crimes and their tort equivalents are actionable even when the motive for the wrongful conduct is benign. E.g., United States v. Kenrick, 221 F.3d 19, 28 (1st Cir. 2000); Reddy v. CFTC, 191 F.3d 109, 119 (2d Cir. 1999); United States v. Simpson, 950 F.2d 1519, 1524-25 (10th Cir. 1991); Buechin v. Ogden Chrysler-Plymouth, Inc., 511 N.E.2d 1330, 1336 (Ill. App. 1987).

It appears that Zahid was aided and abetted in his fraud by Ramada, although this is unclear and Ramada is not a party. Eastern claims that Zahid was also aided and abetted by Refco. We have said that there is no tort of aiding and abetting, Renovitch v. Kaufman, 905 F.2d 1040, 1049 (7th Cir. 1990); Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 452 (7th Cir. 1982), but of course without meaning that one who aids and abets a tort has no liability. The distinction is between a separate tort of aiding and abetting, and aiding and abetting as a basis for imposing tort liability. Although a number of cases do speak of a "tort of aiding and abetting," e.g., Hurley v. Atlantic City Police Dept., 174 F.3d 95, 127 (3d Cir. 1999); Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 251 (4th Cir. 1997); GCM, Inc. v. Kentucky Central Life Ins. Co., 947 P.2d 143, 146 (N.M. 1997); Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983), most of them also contain language suggesting that aiding and abetting is a

basis for imposing liability for the tort aided and abetted rather than being a separate tort. E.g., id. at 481; Hurley v. Atlantic City Police Dept., supra, 174 F.3d at 126; GCM, Inc. v. Kentucky Central Life Ins. Co., supra, 947 P.2d at 148. That is the approach taken by the Commodity Exchange Act and the cases interpreting it, 7 U.S.C. sec. 25(a)(1); Damato v. Hermanson, 153 F.3d 464, 470, 473 (7th Cir. 1998); Nicholas v. Saul Stone & Co., 2000 WL 1093319, at *4-8 (3d Cir. Aug. 7, 2000); Tatum v. Legg Mason Wood Walker, Inc., 83 F.3d 121, 123 n. 3 (5th Cir. 1996) (per curiam), and it is also the dominant approach in Illinois, see, e.g., Congregation of the Passion v. Touche Ross & Co., 636 N.E.2d 503, 508 (Ill. 1994); Freese v. Buoy, 576 N.E.2d 1176, 1182 (Ill. App. 1991); Sklan v. Smolla, 420 N.E.2d 575, 578 (Ill. App. 1981), although a couple of cases have language (weakly) consistent with the separate-tort idea. Carter Coal Co. v. Human Rights Comm'n, 633 N.E.2d 202, 205 (Ill. App. 1994); Wolf v. Liberis, 505 N.E.2d 1202, 1208 (Ill. App. 1987).

The dominant approach is also the better approach. There is nothing to be gained by multiplying the number of torts, and specifically by allowing a tort of aiding and abetting a fraud to emerge by mitosis from the tort of fraud, since it is apparent that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud, McClellan v. Cantrell, 217 F.3d 890, 894–95 (7th Cir. 2000); Cenco, Inc. v. Seidman & Seidman, supra, 686 F.2d at 452-53, in just the same way that the criminal law treats an aider and abettor as a principal. E.g., 18 U.S.C. sec. 2; United States v. Loscalzo, 18 F.3d 374, 383 (7th Cir. 1994); United States v. Hodge, 211 F.3d 74, 77 (3d Cir. 2000). Law should be kept as simple as possible. One who aids and abets a fraud is guilty of the tort of fraud (sometimes called deceit); nothing is added by saying that he is guilty of the tort of aiding and abetting as well or instead.

Eastern argues that Refco knew that Zahid was acting without authority in making these huge speculative trades and that it turned a blind eye because huge trades generate huge commissions. If this is the correct description of the situation (a big if, however), Refco was guilty of participating in Zahid's fraud. The point is not that Refco failed to blow the whistle on Zahid; there is no general duty in tort law, a variant of a "good Samaritan" duty, to report someone else's fraud or other misconduct to the victim of it, IIT v. Cornfeld, 619 F.2d 909, 927 (2d Cir. 1980); cf. Chiarella v. United States, 445 U.S. 222, 234-35 (1980); Lightning Lube, Inc. v. Witco

Corp., 4 F.3d 1153, 1185 (3d Cir. 1993); National Union Fire Ins. Co. v. Woodhead, 917 F.2d 752, 757 (2d Cir. 1990), any more than there is a general duty to warn or otherwise assist a victim or potential victim of an injury tortious or otherwise. Gust K. Newberg Construction Co. v. E.H. Crump & Co., 818 F.2d 1363, 1367 (7th Cir. 1987); see generally Richard A. Epstein, Torts sec. 11.2 (1999); W. Page Keeton et al., Prosser and Keeton on the Law of Torts sec. 56, pp. 375-76 (5th ed. 1984). But that's a rule about the duty, or rather lack of duty, of a bystander. If Refco was the paid executant of the fraud, it could not describe itself as a bystander. Indeed, as the agent of the partnership, Refco, if it knew of Zahid's unfaithful dealing with his partners, had a duty to inform those partners. See Rookard v. Mexicoach, 680 F.2d 1257, 1262 (9th Cir. 1982); Charlotte Aircraft Corp. v. Purdue Airlines, Inc., 498 F.2d 152, 156 (8th Cir. 1974); Restatement of Agency (Second) sec. 381 and comment a (1957). It could not hide behind the customer agreement, which authorized it to execute trades ordered by any of the general partners, including Zahid. That was not authorization to connive with one of the partners to defraud the partnership.

We may assume, therefore, that Eastern made out a prima facie case of fraud (if not, its claim should have been dismissed before trial). It was not a strong case, so it is unlikely that, in finding that Refco did not in fact commit fraud, the jury was confused by the instruction on ratification. But in any event, as we have said and must now explain, there was enough evidence of ratification to justify the giving of such an instruction, though not for two of the three reasons given by Refco. The first is that Zahid's knowledge is imputed to the partnership and so his partners necessarily approved of his speculative trading; that is, the partnership was doing the trading, and it couldn't defraud itself. This reasoning obviously is wrong, Ash v. Georgia-Pacific Corp., 957 F.2d 432, 436 (7th Cir. 1992); Marine Midland Bank v. John E. Russo Produce Co., Inc., 405 N.E.2d 205, 212-13 (N.Y. 1980); Restatement of Agency, supra, sec. 282(1), as it would provide a legal immunity for anyone who assisted one partner to defraud another.

The second bad ground for ratification is the carelessness of Zahid's partners in failing to monitor his activities, especially after the Republic episode. Their carelessness would be a defense had Zahid been defrauding a third party, such as customers of Eastern, on behalf of Eastern, as in our Cenco case, 686 F.2d at 454-56; see also Restatement of Agency, supra, sec.sec. 282(2)(a), (c) and comment h; cf. In re

Bonnanzio, 91 F.3d 296, 303 (2d Cir. 1996); New England Tank Industries of New Hampshire, Inc. v. United States, 861 F.2d 685, 693 n. 16 (Fed. Cir. 1988); but cf. Prudential-Bache Securities, Inc. v. Citibank, N.A., 536 N.E.2d 1118, 1125-26 (N.Y. 1989). They would then be the beneficiaries of a successful fraud suit against Refco and would thus be seeking to profit from a fraud that they could have prevented had they exercised due care. But Zahid was defrauding his partners, and contributory negligence is not a defense to fraud. E.g., Dexter Corp. v. Whittaker Corp., 926 F.2d 617, 620 (7th Cir. 1991); Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp., 910 F.2d 1540, 1546 (7th Cir. 1990); Douglas County Bank & Trust Co. v. United Financial Inc., 207 F.3d 473, 479 (8th Cir. 2000).

The good ground for a defense of ratification (or, better, consent) here is that the partnership, though warned of Zahid's speculative propensities and unilateralism by the Republic episode, decided to leave the management of the commodities trading side of Eastern's business to him. They gave him carte blanche, not only in the terms of the customer agreement with Refco but also in their refusal to review his transactions or otherwise monitor or supervise, let alone participate in, his trading activities. They trusted him, and authorized him, to speculate responsibly. Although in the end his speculative trading was a flop, during much of the 18-month period of his trading through Refco he made money for the partnership. The partners were happy when things were going well, and they cannot, by a retroactive cancellation of his authority, shift the cost when things went badly to Refco, which in following Zahid's directions thought it was doing what the partnership wanted it to do. The partners were not defrauded if they authorized the conduct that they now denounce as fraud, either knowing exactly what Zahid was doing or choosing to turn a blind eye to it, e.g., Chauffeured Limousine Co. v. Runnfeldt Investment Corp., supra, 910 F.2d at 1547, or if they led Refco to believe that Zahid's risky trades were authorized. If the partners did not originally authorize his speculations, they either ratified them by failing to repudiate them upon discovery of them, e.g., Progress Printing v. Jane Byrne Political Committee, 601 N.E.2d 1055, 1067-68 (Ill. App. 1992); Chalet Ford, Inc. v. Red Top Parking, Inc., 379 N.E.2d 88, 91 (Ill. App. 1978); Restatement of Agency, supra, sec. 82 and comment b, or misled Refco into thinking they had ratified them. If Refco was misled, it was not a defrauder, since fraud is an intentional tort.

We turn now to Eastern's challenge to the counterclaim. The counterclaim resulted in an

award of $14 million to Refco, Inc. for breach of contract. The loan to Eastern giving rise to the debt that precipitated the counterclaim was made not by Refco, Inc., however, but by Refco Capital, which was dismissed before trial on the ground that there was no consideration for the promissory note that Eastern had given Refco, Inc. and the latter had assigned to Refco Capital, furnishing the only basis for Refco Capital's claim. Because the customer agreement already obligated Eastern to repay any debit in its account with Refco, Inc., the promissory note that Eastern gave Refco, Inc. and the latter in turn gave Refco Capital was not supported by consideration. That is to say, there was no fresh consideration for it; it was just a repetition of an already existing obligation. It is true that the doctrine of "moral consideration" makes enforceable, without any fresh consideration, the promise of a debtor to pay a debt that is no longer enforceable (maybe because the statute of limitations has run), E. Allan Farnsworth, Contracts sec. 2.8, pp. 56-57 (3d ed. 1999), but Refco never mentioned the doctrine; so it was waived and Refco Capital was out as a counterclaimant. But that left the customer agreement, which Refco, Inc. did not assign to Refco Capital. That agreement, as we said, required Eastern to make good on its debit. But, says Eastern, there was no debit; it was erased by the loan from Refco Capital. The loan made Refco, Inc. whole and Refco Capital the only creditor. And Refco Capital is no longer a party.

Questions of "veil piercing" ordinarily arise when a creditor is trying to go after a shareholder or affiliate of his debtor, and when that is so the veil can be pierced and the shareholder or affiliate reached only in circumstances not relevant to this case. Here we have a case in which the creditor's affiliate (Refco Capital is the creditor, and Refco, Inc., the only remaining counterclaimant, is the affiliate) is trying to pierce the veil that would ordinarily separate it from the creditor, in order to defeat a defense to the creditor's suit--the lack of consideration for the promissory note, which, in the absence of any invocation of the doctrine of moral consideration, bars Refco Capital from suing to collect the note. There is nothing to prevent using the concept of piercing the corporate veil in this way to accomplish elementary justice, however. It isn't done very often, but there is ample authority for doing it when appropriate. United States v. Scherping, 187 F.3d 796, 801-04 (8th Cir. 1999); McCall Stock Farms v. United States, 14 F.3d 1562, 1568 (Fed. Cir. 1993); Towe Antique Ford Foundation v. IRS, 999 F.2d 1387, 1390-94 (9th Cir. 1993); Roepke v. Western National Mutual Ins. Co., 302 N.W.2d 350, 352-53

(Minn. 1981); Olen v. Phelps, 546 N.W.2d 176, 180-81 (Wis. App. 1996); Crum v. Krol, 425 N.E.2d 1081, 1087-89 (Ill. App. 1981); Earp v. Schmitz, 79 N.E.2d 637, 639-40 (Ill. App. 1948). The purpose of limited liability is to encourage investment, Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law, ch. 2 (1991), and is not engaged by the effort of an affiliate to collect a debt nominally owed another affiliate. Eastern inflicted a loss of $14 million on Refco which, the jury could and did find, the contract between Eastern and Refco made it the obligation of Eastern to bear. The customer agreement gave Refco, Inc. a prima facie claim that Eastern owed it $14 million. Eastern's defense is that the money was paid--by Refco Capital. To that, Refco, Inc. rebuts that Refco Capital is as a practical matter the same entity as Refco, Inc., and so the payment was illusory and the defense fails. We agree.

Now it is true that for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate, with which it has a complete identity of interest by virtue of the fact that both Refco corporations are wholly owned by a third corporation. Eastern points us to nothing indicating that what Refco did was illegal, however, and the jury was not required to find, and did not find, that it was a fraud against Eastern (which argues that the infusion of cash into the account delayed the discovery by Zahid's partners of his huge losses), for the jury rejected Eastern's claim of fraud. Why Eastern should escape its contractual obligation because of intercorporate transactions that have no economic significance or relation to Eastern's rights escapes us.

All this rigamarole would have been avoided if instead of arranging a loan to Eastern to cover the deficit in Eastern's account, Refco, Inc., the creditor on the account, had gone after Eastern directly, without bringing Refco Capital into the picture. Although the rigamarole may have been for the disreputable purpose of fooling the Board of Trade or the Commodity Futures Trading Commission, we do not think an appropriate sanction is a forfeiture of Refco, Inc.'s valid claim and a windfall to its defaulting customer.

The last issue concerns the attorneys' fees that the district court refused to award Refco, precipitating the cross-appeal. The court refused on the ground of waiver, the issue of attorneys' fees not having been specified in the pretrial

order as an issue for trial. The refusal was error, because the issue of attorneys' fees was not a triable issue. The customer agreement obligated Eastern to reimburse Refco for the cost (including reasonable attorneys' fees) of collecting any unpaid debit in the account. There was no issue of entitlement to attorneys' fees to submit to the jury. Compare McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313-14 (2d Cir. 1993). Either Refco prevailed on its claim for the unpaid debit of $14 million and was therefore entitled to reasonable attorneys' fees, or Eastern prevailed and Refco therefore was entitled to no attorneys' fees. The issue of attorneys' fees (including amount) was therefore an issue to be resolved after the trial on the basis of the judgment entered at the trial, Rissman v. Rissman, No. 00-2141 (7th Cir. Oct. 2, 2000); Jannotta v. Subway Sandwich Shops, Inc., 2000 WL 1222052, at *3 (7th Cir. Aug. 29, 2000); Capital Asset Research Corp. v. Finnegan, 216 F.3d 1268 (11th Cir. 2000) (per curiam); Ideal Electronic Security Co. v. International Fidelity Ins. Co., 129 F.3d 143, 150 (D.C. Cir. 1997), just as in cases in which statutory rather than contractual entitlements to attorneys' fees are involved. E.g., Hensley v. Eckerhart, 461 U.S. 424, 433 and n. 7 (1983); Hamilton v. Daley, 777 F.2d 1207, 1212 (7th Cir. 1985); MidAmerica Federal Savings & Loan Ass'n v. Shearson/American Express, Inc., 962 F.2d 1470, 1475 (10th Cir. 1992).

The judgment against Eastern on the main claim and in favor of Refco, Inc. on the counterclaim is affirmed, but the denial of attorneys' fees is reversed with directions to the district court to award Refco its attorneys' fees in accordance with the terms of the customer agreement.

Affirmed in Part, Reversed in Part, and Remanded with Directions.